**UNITED STATES of America,**
**Appellee,**

v.

**Moshe MILSTEIN, Defendant–**
**Appellant.**

**Docket Nos. 01–1499, 03–1414.**

United States Court of Appeals,
Second Circuit.

Argued: May 24, 2004.

Decided: March 10, 2005.

58

Kenneth M. Breen, Assistant United States Attorney, New York, New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Barbara D. Underwood, Assistant United States Attorney, New York, New York, on the brief), for Appellee.

Richard A. Greenberg, New York, New York (Steven Y. Yurowitz, Newman & Greenberg, New York, New York, on the brief), for Defendant–Appellant.

Before: VAN GRAAFEILAND *, KEARSE, and WESLEY, Circuit Judges.

PER CURIAM:

Defendant–Appellant Moshe Milstein ("Milstein") appeals a judgment of the United States District Court for the Eastern District of New York (Dearie, *J.*), entered September 5, 2001, convicting him after a jury trial of distributing misbranded drugs in interstate commerce with fraudulent intent, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2) (Count Three); knowingly distributing wholesale prescription drugs in interstate commerce without a required state license, in violation of 21 U.S.C. §§ 331(t), 333(b)(1), and 353(e)(2)(A) (Count Four); knowingly distributing prescription drugs in violation of criminal trademark laws, 18 U.S.C. § 2320(a) (Count Two); distributing wholesale prescription drugs without providing the required history of transactions, in violation of 21 U.S.C. §§ 331(t), 333(a)(2), and 353(e)(1)(A) (Count Five); and conspiracy to commit the first three above-mentioned crimes, in violation of 18 U.S.C. § 371 (Count One). The District Court sentenced Milstein, under the Sentencing Guidelines ("Guidelines"), to 48 months in prison followed by three years of supervised release; fined him $25,000; and imposed a special assessment of $300. The Court also ordered Milstein to pay approximately $3.5 million in restitution to the drug companies that held the trademarks he had infringed.

On appeal, Milstein contends principally that the district court (a) erred in allowing the government to obtain a midtrial superseding indictment, (b) made erroneous evidentiary rulings, and (c) gave erroneous instructions to the jury. He also challenges the constitutionality of the federal statute requiring states to have a federally mandated scheme for licensing wholesale drug distributors engaged in interstate commerce. Finally, he contends that his sentence was impermissibly enhanced based on misinterpretations of the Guidelines and on facts not found by the jury, and that he is entitled to be resentenced in any event because the Guidelines, treated as mandatory, are unconstitutional. For the reasons that follow, we vacate the judgment of conviction on Count Three; we remand for further proceedings with respect to that count and for resentencing; and we affirm the convictions on the other counts.

* The Honorable Ellsworth A. Van Graafeiland, who was a member of the panel, died on November 20, 2004. Prior to his death, he participated in the consideration and decision of this case and had initial responsibility for the opinion of the Court.

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence at trial, taken in the light most favorable to the government, revealed the following. Through several business entities, Milstein and others bought, repackaged, and sold foreign prescription drugs: Eldepryl, a medication used to treat Parkinson's disease, and the fertility drugs Pergonal and Metrodin.

The Food and Drug Administration ("the FDA") regulates the sale of prescription drugs, including Eldepryl, Pergonal, and Metrodin, in the United States. During the period of Milstein's drug sales, the only FDA-approved distributor of Eldepryl in the United States was Somerset Pharmaceuticals, Inc., of Tampa, Florida. The only FDA-approved distributor of Pergonal and Metrodin in the United States was Serono Labs USA, a subsidiary of Laboratories Serono, S.A., of Aubonne, Switzerland.

The Eldepryl, Pergonal, and Metrodin distributed in the United States by these companies were manufactured and packaged outside the United States in compliance with FDA standards. The companies also produced these drugs for distribution outside the United States with different packaging, and not necessarily in compliance with FDA standards.

Federal law imposes numerous requirements on the distribution of prescription drugs, of which three are relevant here. First, the law forbids distribution in interstate commerce of drugs that are misbranded. *See* 21 U.S.C. §§ 331(a), 333(a)(2), 352(a), (b), (i)(1), (j), 321(n). Second, the law forbids wholesale distribution of prescription drugs in interstate commerce without a state license. *See* 21 U.S.C. §§ 331(t), 333(b)(1), 353(e)(2)(A). Third, the law forbids wholesale distribution of prescription drugs without providing a history of transactions from the original manufacturer. *See* 21 U.S.C. §§ 331(t), 333(a)(2), 353(e)(1)(A). In addition, prescription drugs are subject to the general federal statutory prohibition of trafficking in counterfeit goods. *See* 18 U.S.C. § 2320.

The Government established at trial that Milstein and others purchased Eldepryl, Pergonal, and Metrodin produced for distribution outside the United States, stripped them of their original factory packaging, repackaged them with forged labels and packaging materials closely resembling those of drugs produced in accordance with FDA requirements for the U.S. market, and then fraudulently sold the drugs in the United States to doctors, pharmacists, and pharmaceutical wholesalers.

The principal witnesses at trial were Albert Silberberg, Alan Weisberger, and Alan Rosenblum, business associates of Milstein, who were not charged with any crimes in connection with this scheme. According to their testimony and other evidence, Milstein began distributing misbranded and counterfeit Pergonal in late 1991, and thereafter added Metrodin and Eldepryl. Milstein obtained foreign Pergonal, Metrodin, and Eldepryl from one George Braun at prices lower than commanded by those drugs when prepared for the U.S. market.

Government lab analysis showed that the drugs Milstein distributed were not identical to the drugs prepared by their manufacturers for the U.S. market. The active ingredient in Milstein's Pergonal and Metrodin did not come from the same batch as the active ingredient in the drugs produced by the European manufacturer, Ares–Serono, for U.S. distribution. Moreover, some of the saline solution in the saline ampules packaged with Milstein's Pergonal and Metrodin contained quanti-

ties of bacteria and endotoxins, and therefore were not sterile. Milstein's Eldepryl also differed from the drug produced for the American market: his tablets were thicker, were off-white instead of white, and had dirt particles embedded in them. The Government alleged that Milstein was personally involved in repackaging the drugs to make it appear that they were produced for the U.S. market in accordance with FDA standards.

The Government also asserted that Milstein took substantial measures to hide his unlawful conduct from the Government. Specifically, the Government claimed that Milstein first sold his drugs through a company called WSE Distributors ("WSE"), and later formed a company called Gem Distributors ("Gem"), through which to sell the bulk of his drugs. Milstein needed a prescription drug wholesaler license to show to his customers. Rather than register and obtain a New York license to operate as a prescription drug wholesaler in New York (as he otherwise would be required to do since Gem did all of its business in New York), Milstein registered WSE and later Gem as prescription drug wholesalers in New Jersey.

Actually, WSE's wholesaler application was filed in the name of Milstein's associate, Alan Weisberger. The Government also offered evidence that Milstein filed the wholesaler application for Gem in the name of Irving Goldstein. Milstein signed Goldstein's name, and five of Milstein's fingerprints were found on Gem's wholesaler filings. Milstein set up a fake supplier, Landys Ltd., in Hollywood, Florida, to make it appear that Gem had a legitimate supplier. After Milstein became aware of the investigation into his activities, he gave Silberberg fictitious Landys Ltd. invoices and a business card for Mark Landys, with instructions to show them to the FDA.

When an investigation of Milstein's activities appeared likely, Milstein transferred more than $400,000 in profits to his bank account in Israel by means of a complicated series of transactions, routed through accounts in Switzerland and Israel. When FDA agents eventually questioned Milstein regarding his drug sales, he falsely identified Goldstein as the owner of Gem, and Landys Ltd. as Gem's source for drugs. However, Goldstein's father testified that Goldstein was mentally unstable and not "well enough to be an owner of a chicken coop," and the Government's financial analysis showed that Goldstein received no profits from Gem.

In early September 1993, shortly before his interview with FDA agents, Albert Silberberg told Milstein he was worried about investigation rumors and wanted to stop distributing Milstein's drugs. Consequently, Milstein arranged to sell directly to Silberberg's largest customer, Alan Rosenblum. Milstein's business associate Menachem Korall, using the name Mark Landys, then contacted Rosenblum, and the Pergonal and Metrodin sales continued. The continued illegal sales were accomplished through a new fictitious entity, M. Vase & Co., at a non-existent address. Rosenblum received deliveries of Pergonal and Metrodin on September 15, September 29, October 18, and December 6, 1993.

In September 1998, a grand jury returned an indictment charging Milstein, along with co-defendants Ethel Milstein and Menachem Korall, with criminal trademark infringement, distribution of misbranded drugs in interstate commerce, wholesale distribution of prescription drugs without the required state license, wholesale distribution of prescription drugs without providing required documentation of transaction history, and conspiracy to commit the first three of those crimes.

On January 26, 2000, a grand jury returned a superseding indictment directed to Milstein and one of his co-defendants, charging the five counts described above and adding a sixth count, alleging the filing of a false tax return. The Government also had recently discovered evidence that some of Milstein's prescription fertility drugs were contaminated with bacteria, and that evidence also was presented to the grand jury that returned the superseding indictment; but the Government did not have that portion of the indictment amended to reflect the newly-discovered evidence.

The superseding indictment, however, was imperfectly drafted. On March 8, 2000, immediately after the swearing in of the trial jury, Milstein moved for a judgment of acquittal on Count Four (wholesale distribution of prescription drugs without a state license) for failure to allege the jurisdictional element, *i.e.*, that the transactions took place in interstate commerce. In response, the Government sought leave to return to the grand jury to add an allegation of interstate commerce to the indictment. Meanwhile, the presentation of evidence at trial continued.

The Government received permission on March 17, 2000 to obtain an amendment of Count Four in order to meet the jurisdictional requirement. This task was accomplished in a novel manner. The District Court granted a midtrial "theoretical ... mistrial" on Count Four, prompted by the "manifest necessity" of Milstein's motion for acquittal based on Count Four's jurisdictional defect. (Trial Transcript ("Trial Tr.") at 1490.) The Government returned to the Grand Jury to secure an amendment of Count Four to allege the omitted jurisdictional element. In the meantime, the court allowed the trial to continue uninterrupted on all counts and announced that the evidence presented at the ongoing trial would be deemed presented in connection with the anticipated amended indictment. (*See id.* at 1491.)

On March 22, 2000, the Grand Jury returned a second superseding indictment, adding the phrase "in interstate commerce" in three places: paragraph 19 in Count Four (wholesale distribution of prescription drugs without a state license); paragraph 12(a) in Count One (charging conspiracy to commit the crime charged in Count Four); and paragraph 8 in the introductory section of the indictment that was incorporated by reference into Counts One through Five. Milstein was arraigned on the second superseding indictment on March 28, 2000, and entered a plea of not guilty without waiving his objection to the procedure. The Court then incorporated all of the prior trial evidence *nunc pro tunc* into the record of the trial on the second superceding indictment.

A jury convicted Milstein of Counts One through Five, and he entered a conditional guilty plea to the tax count, which had been severed from the counts tried. The District Court sentenced Milstein to 48 months in prison and three years' supervised release, fined him $25,000, and imposed a special assessment of $300. The District Court also ordered restitution to the victimized drug companies in the amount of approximately $3.5 million. Milstein has been released on bail pending this appeal.

## DISCUSSION

### I. *Criminal Trademark Infringement (Count Two)*

Milstein challenges his conviction on Count Two, intentionally trafficking in prescription drugs known to be counterfeit, in violation of criminal trademark laws ("Count Two"), 18 U.S.C. § 2320, asserting two errors: (1) that the District Court

improperly instructed the jury as to what constitutes a "counterfeit mark"; and (2) that the District Court erroneously refused to permit the jury to consider a defense of laches.

### A. *Jury Instruction on "Counterfeit Mark"*

A "counterfeit mark" is a "spurious mark ... identical with, or substantively indistinguishable from," a registered trademark, "the use of which is likely to cause confusion, to cause mistake, or to deceive." 18 U.S.C. § 2320(e)(1)(A)(i-iii). At trial, Milstein conceded that he bought genuine prescription drugs made for foreign markets and then repackaged them for sale in the United States without the consent of the drugs' manufacturers. However, Milstein requested a jury instruction that a "spurious" mark is one used in connection with goods that are not "genuine" or are so altered as to lose their genuine character. The District Court refused, instructing the jury that "[a] counterfeit mark is a spurious mark or a mark that is not genuine," and "in order for the mark to be genuine, it must be placed there by the legitimate owner of the mark or with the owner's authorization." The Court further instructed, "[i]f you find that a good's production process includes the process of packaging, you may then find that the good does not bear a genuine mark if the good was repackaged using a trademark without authorization."

On appeal, Milstein contends that selling repackaged genuine goods is not a crime, and that "if the court's instruction were a correct statement of the law, any repackaging of genuine product would be a criminal trademark counterfeiting offense, even where, as here, there was no allegation that the packaging itself was trademarked." (Milstein brief on appeal at 62.) Milstein relies primarily on the Fifth Circuit's opinion in *United States v. Hanafy*, 302 F.3d 485, 486–89 (5th Cir.2002) ("*Hanafy*"), which held that attaching a trademark to repackaged baby formula would not give rise to § 2320 liability. The Fifth Circuit suggested that, in the civil infringement context, Supreme Court precedent would require any repackaged good bearing a trademark to be "marked as having been repackaged." *Id.* at 488 (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368–69, 44 S.Ct. 350, 68 L.Ed. 731 (1924)); *cf. Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085–86 (9th Cir.1998). The *Hanafy* court declined to apply such a rule in the criminal context, however, reasoning that "Lanham Act precedent is of little value in a § 2320 case because the Lanham Act deals with civil liability." *Hanafy*, 302 F.3d at 489 (citing *United States v. Giles*, 213 F.3d 1247, 1250 (10th Cir.2000)). *But see United States v. Hon*, 904 F.2d 803, 805 (2d Cir.1990) ("There is no doubt that Congress wished to incorporate the Lanham Act's confusion requirement into 18 U.S.C. § 2320 and did so.").

*Hanafy* is readily distinguishable. The defendant in *Hanafy* resold cans of baby formula in trays that resembled trays used by manufacturers to sell the same product, bore the trademark holders' mark, and "contain[ed] no more information than that which [wa]s carried on the cans themselves." 302 F.3d at 486, 488. By contrast, Milstein "sold Eldepryl, Pergonal and Metrodin in forged packaging bearing false lot numbers." (Milstein brief on appeal at 9.) While the cans in *Hanafy* were "merely being repackaged, such that consumers could be sure of the goods' quality and source," *United States v. Farmer*, 370 F.3d 435, 441 n. 1 (4th Cir.2004) (citing *Hanafy*, 302 F.3d at 486), the drugs here were repackaged so that consumers would believe foreign versions of the drug were in fact domestic, FDA-approved versions (*see* Milstein brief on appeal at 60).

Milstein admits that the drugs "were repackaged in counterfeit packaging with phony lot numbers designed to resemble the authentic packaging approved by the [FDA]." (*Id.*) Although § 2320 has been read "effectively [to] exclude[ ] from the definition [of "counterfeit mark"] parallel imports, gray goods and production over-runs," 4 *McCarthy on Trademarks* § 25:14 (2004), Milstein did more than resell parallel imports or gray goods. He obscured the fact that the drugs had been repackaged, and, with his package design, fraudulently conveyed that the foreign drugs had been manufactured as FDA-approved products. Moreover, he removed identifying codes from the repackaged goods. *Cf. John Paul Mitchell Systems v. Pete–N–Larry's Inc.*, 862 F.Supp. 1020, 1026–27 (W.D.N.Y.1994). In all the circumstances, given, *inter alia*, Milstein's knowing repackaging of the drugs without the trademark holders' authorizations, the jury permissibly convicted Milstein of violating § 2320(a).

### B. *Jury Instruction on Laches Defense*

■ Milstein next contends that the District Court erred in failing to instruct the jury that laches was available as a defense to Count Two. Milstein cites 18 U.S.C. § 2320(c), which provides that "[a]ll defenses, affirmative defenses, and limitations on remedies that would be applicable in an action under the Lanham Act shall be applicable in a prosecution under this section." "It is well established that the equitable defense of laches may be applied to cases brought under the Lanham Act." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 193 (2d Cir.1996) (citing 15 U.S.C. § 1069 ("In all inter partes proceedings equitable principles of laches . . . where applicable may be considered and applied.")). Therefore, Milstein argues, the District Court erred in refusing to instruct the jury that the defense of laches,

which requires that the defendant prove unreasonable delay resulting in prejudice, *see, e.g., King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir.1992), was available to him. We disagree.

■ We begin by noting that, in the criminal context, the relevant statute of limitations, as well as the speedy trial safeguards of the Due Process Clause, *see, e.g., United States v. Lovasco*, 431 U.S. 783, 789–790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), serve to protect a defendant's interests against unreasonable delay. Further, it is well established that, as a general rule,

> [l]aches is not a defense to an action filed within the applicable statute of limitations, *United States v. Mack*, 295 U.S. 480, 489, 55 S.Ct. 813, 817, 79 L.Ed. 1559 (1935), nor is it available against the United States, *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940).

*United States v. RePass*, 688 F.2d 154, 158 (2d Cir.1982). We have found no case applying a laches defense in the criminal context.

Of course, Congress could have provided that, in this context, such a defense would be available. Against the backdrop of these well-established principles, however, we decline to interpret the statutory scheme in that way. Section 1069 states that the laches defense may only be applied "where applicable"; thus indicating that it may be applied in the criminal context at most where it would be applicable in an analogous civil context. Because laches may not be asserted against the United States in a civil matter, *see United States v. Angell*, 292 F.3d 333, 338 (2d Cir.2002) ("laches is not available against the federal government when it undertakes to enforce a public right or protect the public interest"), it seems that it is equally inapplicable against the Government in a criminal prosecution.

Further, the manifest purpose of 15 U.S.C. § 1069 is to encourage trademark holders timely to assert their rights against alleged infringers and to protect to some extent the alleged infringers' reliance interests. *See generally Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d at 192–93. However, when or whether a trademark holder asserts its right against an alleged infringer is irrelevant to the Government's decision to begin a prosecution for criminal trademark infringement; criminal liability irrevocably attaches at the time of the willful infringement irrespective of the subsequent behavior of either the infringer or the trademark holder. Unlike other defenses to infringement, those contained in § 1069 do not go to the question of the alleged infringer's substantive liability, and therefore are not incorporated by § 2320(c).

Lastly, we note that construing the defense of laches to apply to prosecutions under § 2320 would lead to absurd results. The equitable doctrine of "unclean hands," it seems, would prevent its application in every prosecution under that section. As the Supreme Court has explained, "[t]he equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage." *Bein v. Heath,* 47 U.S. (6 How.) 228, 246–47, 12 L.Ed. 416 (1848). Because "willful infringement" necessarily involves fraudulent acts, anyone convicted of it would be unable as a matter of law to benefit from a laches defense. Therefore we conclude that § 2320(c) does not evince a congressional intent to extend the equitable defense of laches to criminal prosecutions.

## II. *Misbranding (Count Three): Constructive Amendment*

Milstein also was convicted of distributing misbranded drugs in interstate commerce with fraudulent intent, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2) (Count Three). The indictment on that count alleged that "[f]orgery or falsification of any part of the packaging material, including the instructional inserts, lot numbers or expiration dates, renders the drug misbranded under federal law," and that Milstein and others "regularly distributed [the modified drugs] that had been repackaged using forged materials." It further alleged that "[t]hey sold these re-packaged drugs as if they were the original product from the licensed manufacturers, thus distributing misbranded drugs."

Following Milstein's indictment, the Government claims to have learned that Milstein's drugs also were "contaminated" with bacteria and endotoxins. The Government contended that its contamination evidence was relevant to Count Three, charging Milstein with selling "misbranded" drugs, because saline ampules labeled "sterile" could be considered mislabeled if they were contaminated. On its return to the Grand Jury to obtain the second superseding indictment adding the interstate commerce allegation to other counts, the Government also presented testimony regarding the contamination evidence to the grand jury. The Government did not, however, secure an amendment to Count Three of the indictment to allege that the drugs had been misbranded because they were supposedly sterile when they were not.

Nonetheless, at trial, the Government was allowed to present evidence of the contamination; and the court subsequently instructed the jury that it could find Milstein guilty of misbranding as alleged in Count Three if it found that "the labeling of the ampules of saline diluent suggested untruthfully that these ampules were ster-

ile ... when in fact they were a danger to health" (Trial Tr. 3870). Milstein argues that this instruction, allowing the jury to convict him of misbranding on the basis of the contamination evidence, constructively amended the indictment, leaving it uncertain whether he was convicted of the conduct alleged in the indictment. The Government contends that the generally framed indictment covered the specific theory that the drugs had been misbranded because they were labeled as if they were sterile when in fact they were not.

Although the cases dealing with claims of constructive amendment sometimes appear to reach divergent results, *see, e.g., Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Zingaro,* 858 F.2d 94 (2d Cir.1988); *United States v. Salmonese,* 352 F.3d 608, 620–22 (2d Cir.2003) ("*Salmonese*"); *United States v. Danielson,* 199 F.3d 666, 669–71 (2d Cir.1999); *United States v. Patino,* 962 F.2d 263, 265–67 (2d Cir.1992), the fundamental principle is clear. When the trial evidence or the jury charge operates to "broaden[ ] the possible bases for conviction from that which appeared in the indictment," the indictment has been constructively amended. *United States v. Miller,* 471 U.S. 130, 138, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (emphasis omitted). Constructive amendment is a *per se* violation of the Fifth Amendment. *United States v. Roshko,* 969 F.2d 1, 5–6 (2d Cir.1992). " 'To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.' " *Salmonese,* 352 F.3d at 620 (quoting *United States v. Frank,* 156 F.3d 332, 337 (2d Cir.1998)). There is no con-structive amendment "where a generally framed indictment encompasses the specific legal theory or evidence used at trial." *Salmonese,* 352 F.3d at 620 (internal quotation marks omitted).

In the instant case, we are persuaded that the indictment, charging Milstein with misbranding due to his repackaging of the drugs, was constructively amended when the Government alleged that the drugs were misbranded because they were not sterile. At the time of Milstein's offenses, there were twenty different methods of misbranding, *see* 21 U.S.C. § 352(a)-(t) (1994) (describing ways in which one could misbrand drugs), *amended by, inter alia,* Food and Drug Administrative Modernization Act of 1997, Pub.L. No. 105–115, Title I, §§ 125, 126 (repealing 21 U.S.C. §§ 352(d), 352(k), 352(*l* )). Alleging, as the Government did in the second superseding indictment, that Milstein was charged with misbranding because he "re-packaged drugs as if they were the original product from the licensed manufacturers" would not necessarily place Milstein on notice that the Government would also attempt to prove that the drugs were not sterile. The Government seemed to have recognized this when it presented the contamination evidence to the grand jury in the course of obtaining the amendment alleging the jurisdictional element. However, the Government neglected to have Count Three amended to include the contamination allegation. This is precisely the type of activity against which the Supreme Court cautioned in *Stirone:*

> The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment. Here ... we cannot know whether the grand jury would have included in its indictment a charge that commerce in steel from a nonexistent steel mill had been interfered with. Yet because of

the court's admission of evidence and under its charge this might have been the basis upon which the trial jury convicted petitioner. If so, he was convicted on a charge the grand jury never made against him.

*Stirone,* 361 U.S. at 218–19, 80 S.Ct. 270.

Therefore, we vacate Milstein's conviction on Count Three and remand for a new trial on that count, should the Government wish to pursue the matter, *see, e.g., United States v. Wozniak,* 126 F.3d 105, 111 (2d Cir.1997); *United States v. Mollica,* 849 F.2d 723, 731 (2d Cir.1988).

We reject, however, Milstein's contention that reversal of Count Three requires reversal of all counts as a result of prejudicial spillover from what he characterizes as the "inflammatory" evidence of contamination on which the jury was instructed it could base its verdict on Count Three. As discussed in Part V below, the contamination evidence was admissible in connection with Count One, and thus was properly before the jury.

### III. *Failure To Obtain a State License (Count Four)*

#### A. *Midtrial Superseding Indictment*

■ For two of the substantive counts against Milstein, (*i.e.,* Count Three alleging misbranding, and Count Four alleging the failure to have a state license), distribution in interstate commerce was an essential element of the offense. The indictment alleged such distribution in Count Three (*see* Superseding Indictment ¶ 17 (alleging that Milstein, with intent to defraud, "introduce[d] and deliver[ed] for *introduction into interstate commerce* drugs that were misbranded" (emphasis added))); but Count Four contained no similar allegation. When this omission was brought to the attention of the Government and the court shortly after the commencement of

trial, the Government obtained a superseding indictment that added the phrase "in interstate commerce" to the licensing count.

In order to facilitate that addition, the District Court employed a somewhat unprecedented procedure. The Court declared a "theoretical ... mistrial" prompted by the "manifest necessity" of Milstein's motion for a judgment of acquittal because the count was jurisdictionally defective. The Government returned to the Grand Jury to secure an amendment of the aforementioned count to allege the omitted jurisdictional element. And then the District Court incorporated all the prior trial evidence *nunc pro tunc.* The trial continued, with but a brief interruption for Milstein's arraignment on the new indictment. Milstein claims that this procedure violated his rights under the Double Jeopardy Clause and the statute of limitations. We are not persuaded.

#### 1. *Double Jeopardy*

■ After jeopardy has attached, but before a verdict has been reached, the Double Jeopardy Clause of the Fifth Amendment does not prevent retrial where a mistrial "was required by 'manifest necessity.'" *Illinois v. Somerville,* 410 U.S. 458, 467–68, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). The need to correct a jurisdictionally defective indictment presents one situation in which a mistrial is manifestly necessary. *See id.* at 468–69, 93 S.Ct. 1066. Therefore, at least where there is only minimal delay resulting from the mistrial and the Government is not thereby given the opportunity to strengthen its case, the Double Jeopardy Clause does not prevent retrial in such cases. *See id.* at 469, 93 S.Ct. 1066.

Milstein nevertheless contends that the Double Jeopardy Clause prohibits the procedure employed by the District Court in

**67**

this case. However, given that the Government could have proceeded before a new jury on a new indictment, we cannot agree that allowing his trial to continue before the same jury violated the Double Jeopardy Clause. Indeed, doing so prevented a waste of all parties' "time, energy, and money," minimized almost completely any delay or potential prejudice to Milstein, and preserved his "right to have his trial completed by a particular tribunal"—the very values underlying the Double Jeopardy Clause. *See id.* at 468–70, 93 S.Ct. 1066 (emphasis omitted). Therefore, allowing the prosecution to continue upon the midtrial return of a superseding indictment was appropriate in this case.

Milstein argues that this Court's decision in *United States v. Dhinsa,* 243 F.3d 635 (2d Cir.2001), is to the contrary. In that case, however, the indictment was amended after the close of the Government's case, thus depriving the defense of the opportunity to cross-examine the Government's witnesses, thereby "increas[ing] the burden on [the defendant]'s defense." *Id.* at 668; *see also id.* at 664 (noting that its holding was "limited to the narrow circumstances" of that case). Here, by contrast, the new indictment was returned well before the close of the Government's case, the defense was on notice that the indictment would be superseded even earlier, and no change in defense strategy was required by the addition of the jurisdictional element to Count Four, especially given that distribution in interstate commerce was alleged as an element of Count Three. Therefore, *United States v. Dhinsa* is inapposite, as Milstein was in no way prejudiced by the substitution of the superseding indictment.

### 2. *Statute of Limitations*

■ Milstein also contends that the midtrial superseding indictment violated the statute of limitations, relying on *United States v. Gillespie,* 666 F.Supp. 1137 (N.D.Ill.1987). However, *Gillespie* is not the law of this Circuit. *See United States v. Grady,* 544 F.2d 598 (2d Cir.1976) ("*Grady*"); *United States v. Drucker,* 453 F.Supp. 741 (S.D.N.Y.1978). "Once an indictment is brought, the statute of limitations is tolled as to the charges contained in that indictment." *Grady,* 544 F.2d at 601. Further,

> [w]henever an indictment ... is dismissed for any reason after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned in the appropriate jurisdiction within six calendar months of the date of the dismissal of the indictment ..., which new indictment shall not be barred by any statute of limitations.

18 U.S.C. § 3288. Thus, "a superseding indictment brought at any time while the first indictment is still validly pending," so long as it does not enlarge the first indictment's charges, "cannot be barred by the statute of limitations." *Grady,* 544 F.2d at 601–02.

In the instant case, the District Court, in allowing the Government an opportunity to secure an amendment to Count Four, did not immediately dismiss the first superseding indictment but rather continued the trial proceedings under that indictment. The second superseding indictment did not broaden the charges against Milstein but merely added a jurisdictional allegation, and the trial continued, without hiatus, under the second superseding indictment. Plainly, the second superseding indictment was not barred by the statute of limitations.

### 3. *Validity of Remaining Counts*

■ Milstein's contention that counts other than Count Four should be dis-

missed because of the alleged impropriety in the midtrial amendment to Count Four is moot in light of our above discussion. In any event, even had that midtrial amendment been impermissible, it would have provided no basis on which to disturb Milstein's conviction on the remaining counts. "[A]bsent a showing of prejudice, the erroneous amendment of one count does not destroy other counts of the indictment nor invalidate the judgment of conviction thereon." *United States v. Dhinsa*, 243 F.3d at 667 (internal quotation marks omitted). The Government's failure to allege the jurisdictional element in Count Four had no impact on any of the remaining counts, and Milstein has not shown any prejudice.

### B. *Constitutional Challenge to Statute*

■ The Prescription Drug Marketing Act of 1987 ("PDMA") requires that any wholesaler of prescription drugs who would engage in interstate distribution be licensed by the state from which the drugs are to be shipped, under a state licensing scheme that complies with federal guidelines. *See* 21 U.S.C. § 353(e)(2)(A). Milstein was convicted of violating that provision, and now claims that the statute exceeds Congress's power under the Commerce Clause and violates the Tenth Amendment and the principles of federalism. He asserts that the statutory scheme has the same defects as the statutes struck down in *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), and *Board of Natural Resources v. Brown*, 992 F.2d 937 (9th Cir.1993) ("*Brown*"). We disagree.

■ It is clear Congress may not "commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *New York*, 505 U.S. at 161, 112 S.Ct. 2408 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). "This is not to say that Congress lacks the ability to encourage a State to regulate in a particular way, or that Congress may not hold out incentives to the States as a method of influencing a State's policy choices." *New York*, 505 U.S. at 166, 112 S.Ct. 2408. "Congress may urge a State to adopt a legislative program consistent with federal interests," *id.*, and "it cannot be constitutionally determinative that the federal regulation is likely to move the States to act in a given way, or even to 'coerc[e] the States' into assuming a regulatory role by affecting their 'freedom to make decisions in areas of integral governmental functions,'" *Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. 742, 766, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (quoting *Hodel*, 452 U.S. at 289, 101 S.Ct. 2352).

In *New York*, the Supreme Court struck down part of the Low–Level Radioactive Waste Policy Amendments Act of 1985, Pub.L. 99–240, 99 Stat. 1842, 42 U.S.C. § 2021b *et seq.*, which provided three types of "incentives" to encourage the states to regulate, in accordance with Congress's direction, the disposal of low-level radioactive waste generated within their borders. *New York*, 505 U.S. at 152, 112 S.Ct. 2408. One such "incentive" offered the states the option, in lieu of timely compliance with the federal statute, of "taking title to and possession of ... low level radioactive waste generated within their borders[, thereby] becoming liable for all damages waste generators suffer as a result of the States' failure to do so promptly." *New York*, 505 U.S. at 174–75, 112 S.Ct. 2408. That part of the statute "crossed the line distinguishing encouragement from coer-

cion" and thus violated the Tenth Amendment. *Id.* at 175, 112 S.Ct. 2408.

In *Brown,* the Ninth Circuit held unconstitutional a portion of the Forest Resources Conservation and Shortage Relief Act, 16 U.S.C. §§ 620–620j. *See* 992 F.2d at 940. The statute at that time provided that "[e]ach State *shall determine* the species, grade, and geographic origin of unprocessed timber to be prohibited from export ... *and shall administer* such prohibitions consistent with the intent of sections 620 to 620j of this title." 16 U.S.C. § 620c(d)(2) (emphases added). If the state decided not to administer the federal regulatory program, the state would have had to halt all timber sales, an alternative the Ninth Circuit held Congress had "no authority to command." *Brown,* 992 F.2d at 947.

The choice offered to the States by the PDMA is not equivalent to those in *New York* and *Brown.* Under the PDMA, a state is allowed to choose not to create a licensing framework pursuant to federal guidelines. The consequence is simply that a wholesale distributor may not distribute its prescription drugs from that state to another state. That consequence, though it may move a state to adopt the necessary licensing framework in order to encourage companies to do business in the state, does not transform the provisions of the PDMA into a legislative scheme that is mandatory or coercive. Accordingly, we see no Tenth Amendment violation.

IV. *Failure To Provide History of Transactions (Count Five): Intent To Defraud*

Count Five charged Milstein with failing to provide his customers with the required pedigree information "with the intent to defraud and mislead." The "intent to defraud" element converts conduct that would otherwise be a misdemeanor

into a felony. *See* 21 U.S.C. § 333(a)(1), (2). The District Court charged the jury that "intent to defraud" includes intent to defraud not only the wholesale distributors who made direct purchases from Milstein but also retail consumers and government agencies.

Milstein argues that it is doubtful that the government or consuming public ever can be a contemplated victim of a pedigree offense under 21 U.S.C. §§ 353(e)(1)(A), 333(a)(2). Milstein also asserts that he had no notice that he could have been convicted on the basis of evidence that he intended to defraud the purchasing public and government agencies. Therefore, he contends that the jury instruction violated his due process rights under the Fifth Amendment and the notice requirements of the Sixth Amendment.

Although there seems to be a split in authority, we believe that the Tenth Circuit's opinion in *United States v. Mitcheltree,* 940 F.2d 1329, 1347–50 (10th Cir. 1991), is persuasive, holding that a defendant may be convicted on evidence that government agencies were the subject of the intent to defraud. By misleading governmental agencies, and "thereby frustrating their efforts to protect the public," Milstein "indirectly misled and defrauded the public," thus contravening the "overriding congressional purpose [of] consumer protection" embodied in these provisions. *Id.* at 1348; *see also United States v. Bradshaw,* 840 F.2d 871, 874 (11th Cir. 1988). *But see United States v. Haga,* 821 F.2d 1036, 1044 n. 17 (5th Cir.1987) (expressing doubt that government agencies could be victims of intent to defraud). Additionally, nothing in the language of the pedigree statute precludes the "intent to defraud" provision from applying to the purchasing public. Moreover, Milstein had adequate notice that the government

agencies and the consuming public were possible subjects of his "intent to defraud."

The very nature of the fraud as alleged in the indictment implies an intent to defraud consumers. The indictment alleges that Milstein and others "sold these repackaged drugs as if they were the original product from the licensed manufacturers," a scheme that on its face is designed to deceive all purchasers in the chain of distribution. Moreover, the documents provided by Milstein in discovery included records of his retail pharmacy customers showing patient prescriptions for Milstein's drugs.

Milstein received further notice of the Government's intent to prove that consumers were victims of the fraud when, in response to pre-trial motions, the Government described its contamination evidence, concluding that "[t]hese were powerful and potentially dangerous drugs distributed with a callous disregard for the health and well being of the end users." Similarly, in opposing Milstein's pretrial motion to exclude the contamination evidence, the Government described the scheme as involving "counterfeit prescription drugs that were intended for injection by women having difficulty with conception and that were falsely labeled as sterile and safe for injection when, in fact, they were tainted with microorganisms that could cause infection." Though Milstein claims that these assertions were unscientific melodrama, they plainly placed him on notice that the consuming public was a potential subject of his "intent to defraud."

Likewise, the indictment placed Milstein on notice that the government charged him with intent to defraud government regulators. By charging the falsification of so-called "lot numbers," tools used by the FDA for further regulatory action, the indictment suggested a fraud that was reasonably understood to have been aimed at deceiving regulators. In addition, the Government's response to pretrial motions provided Milstein with a detailed account of the government's plan to prove his efforts to obstruct the FDA investigation, including his false statements to an FDA agent.

Therefore, the District Court correctly charged the jury that it could consider Milstein's intent to defraud customers and regulatory agencies as well as his direct purchasers.

## V. *Conspiracy (Count One)*

### A. *Constructive Amendment*

As discussed in Part II above, the introduction of "contamination evidence" constructively amended Count Three of the Superseding Indictment because that count alleged misbranding through the use of forged packaging materials, and the District Court charged the jury that it could convict Milstein on that count if it found that he distributed goods that were contaminated rather than sterile. Milstein contends that the conspiracy count was similarly flawed because it charged Milstein with conspiring to, among other things, "introduce ... into interstate commerce drugs that were misbranded." We conclude, however, neither the introduction of the contamination evidence nor the district court's instruction pertinent to that evidence requires us to vacate Milstein's conviction on Count One.

It is a "well-established rule of this and other circuits that the overt act element of a conspiracy charge may be satisfied by an overt act that is not specified in the indictment, at least so long [as] there is no prejudice to the defendant." *United States v. Frank*, 156 F.3d 332, 337 (2d Cir.1998). Thus, even if the jury convicted Milstein on the conspiracy count based on evidence of an overt act not

specified in the indictment (*e.g.*, an overt act involving drugs deemed misbranded because they are dangerous to health even when used as their labeling directed), the jury's reliance on that evidence would not require vacatur of Milstein's conspiracy conviction absent some indication that Milstein suffered prejudice as a result. Here, no indication of such prejudice is before us. Milstein had notice of the contamination evidence by August 1999, more than five months before his jury trial began.

 Vacatur of a conviction may be warranted where instructions would permit the jury to "convict the defendant of conspiracy without finding that he had any of the objectives alleged in the indictment." *United States v. Gallerani*, 68 F.3d 611, 618 (2d Cir.1995). Here, however, the jury instructions did not impermissibly broaden the objectives of the conspiracy as alleged in the indictment. The indictment alleged that Milstein and others conspired, *inter alia*, to "introduce and deliver for introduction into interstate commerce drugs that were misbranded." (Second Superseding Indictment ¶ 12.) This objective, as alleged, is sufficiently broad to encompass distribution not only of drugs that are misbranded because they have been repackaged in forged materials that misstate their origin, *see* 21 U.S.C. § 352(a), (b), (*i*)(1), but also of drugs that are misbranded because they are "dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof," *id.* § 352(j).

The indictment also alleged, in the introductory section that was incorporated by reference into Counts One through Five, that Milstein and others "sold . . . re-packaged drugs as if they were the original product from the licensed manufacturers, *thus* distributing misbranded drugs" (Second Superseding Indictment ¶ 6) (empha-

sis added). Although as to the substantive offense charged in Count Three this allegation is sufficiently specific to restrict the government to proving an essential element of the offense (*i.e.*, that the drugs were misbranded) through a particular set of facts (*i.e.*, that the drugs were repackaged using forged materials that mischaracterized their origin), insofar as the conspiracy alleged in Count One is concerned, this allegation at most describes overt acts specified in the indictment. The allegation does not, by its terms, address the objectives of the charged conspiracy, and we do not understand the allegation to narrow those objectives. *Cf. United States v. Salameh*, 152 F.3d 88, 146 (2d Cir.1998) (indictment's repeated references to the World Trade Center did not require the government to prove a specific conspiracy to bomb the World Trade Center where World Trade Center bombing was not listed as an object of the conspiracy, but merely as one of several overt acts alleged to have been committed in furtherance of the alleged conspiracy "to commit offenses against the United States"). Accordingly, we conclude that the introduction of the contamination evidence and the district court's instructions pertinent to that evidence did not constructively amend Count One of the indictment.

### B. *Statute of Limitations*

 Milstein also argues that his conspiracy conviction was barred by the five-year statute of limitations, *see* 18 U.S.C. § 3282. The original indictment against Milstein was returned on September 16, 1998; thus, for the conspiracy charge not to be time-barred, the government was required to allege and prove at least one overt act that occurred on or after September 16, 1993. *See, e.g., Salmonese*, 352 F.3d at 614. The indictment alleged, *inter alia*, that Milstein twice caused checks,

totaling $47,350 and representing proceeds from the sale of prescription drugs, to be deposited in an account at the First International Bank of Israel in Switzerland (the "Swiss account") on September 17, 1993. Those two acts were the only overt acts within the limitations period that were alleged to have been committed by Milstein himself, and he argues that the evidence as to his commission of those acts was insufficient to allow the jury to consider them. He also argues that those two acts were at most mere acts of concealment and therefore that they cannot serve to extend the life of the conspiracy. These contentions are meritless.

To begin with, Milstein's premise, *i.e.*, that the conspiracy charge against him would be time-barred unless the government could prove that Milstein himself committed overt acts within the limitations period, is legally flawed. Foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators. *See, e.g., United States v. Ben Zvi,* 242 F.3d 89, 97 (2d Cir.2001) (statute of limitations depends on timely overt act by either the defendant or a coconspirator). There is no evidence that Milstein had ceased to be a co-conspirator. *See, e.g., United States v. James,* 609 F.2d 36, 41 (2d Cir.1979) (an alleged withdrawal from a conspiracy prior to a given point in time is an affirmative defense that the defendant has the burden of proving by a preponderance of the evidence). Given that the indictment alleged 10 other overt acts by co-conspirators within the five years preceding the indictment, the conspiracy offense charged against Milstein in Count One was not time-barred.

Further, there was ample evidence at trial that the Swiss account was linked to Milstein and his co-conspirators and that the two checks, which were payable to Milstein's company, were deposited on

September 17, 1993. Therefore, the evidence was sufficient to support an inference that Milstein caused the deposit of those two checks into the Swiss account.

Finally, although it is established that "mere overt acts of concealment" of the commission of the crime would not extend the life of a conspiracy after its "central criminal purposes" had been attained, *Grunewald v. United States,* 353 U.S. 391, 401–2, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), we have "consistently ruled that where a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of their anticipated economic benefits." *Salmonese,* 352 F.3d at 615 (internal quotation marks omitted). Thus, efforts to secrete or launder moneys gained from a scheme for monetary gain, and to safeguard them from discovery or recovery, are to be considered acts in furtherance of the conspiracy, rather than mere acts of concealment of the commission of crime. In this case, the checks—payable to Milstein's company—were deposited in the Swiss account, an account that the Government showed was connected to the conspiracy through a series of bank transfers, including prior transfers from the Swiss account to an account maintained by Milstein in Israel, via the account of one of Milstein's co-conspirators. The jury was entitled to infer that the September 17 deposits were part of the conspirators' efforts to reap—and keep—economic gains from their conspiracy and, thus, that those deposits were more than mere acts of concealment of the crime.

VI. *Excluded Co–Conspirator Statements*

Milstein also contends that the District Court erroneously excluded from evidence a tape-recorded conversation,

proffered by Milstein, between Rosenblum and Silberberg. Describing Rosenblum and Silberberg (who were not indicted) as his co-conspirators, Milstein claims the tape should have been admitted into evidence under Federal Rule of Evidence 801(d)(2)(E) as an admission of a co-conspirator. (*See* Milstein brief on appeal at 67–70.) His reliance on that Rule is misplaced.

 "[A] statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is one type of "[a]dmission by party-opponent" defined as nonhearsay, but only if "offered against" the party. Fed.R.Evid. 801(d)(2)(E). The statement of a conspirator, offered for its truth by a co-conspirator, is not within this Rule. *See United States v. Kapp*, 781 F.2d 1008, 1014 (3d Cir.1986).

Milstein's reliance on *United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir.2004), for the proposition that "it should make no difference which party to the litigation the statement is used against" (Milstein reply brief on appeal at 32) is misplaced. That case involved a question of whether the proffered evidence had been sufficiently authenticated, not whether it came within the hearsay rule. Out-of-court statements by the party offering the statements and out-of-court statements by co-conspirators of the party offering the statements, when offered for their truth, remain hearsay and are not admissible unless they fit within an exception to the hearsay rule. No applicable exception has been called to our attention. We conclude that the District Court properly excluded the co-conspirator tape proffered by Milstein.

## VII. *Sentencing*

Finally, Milstein contends that the district court, in calculating his sentence under the 1994 Sentencing Guidelines, erred by enhancing his offense level pursuant to U.S.S.G. § 3A1.1 on account of the vulnerability of his victims and § 2F1.1(b)(1) for the amount of loss caused by his offense. He also contends that application of the Guidelines on a mandatory basis is unconstitutional.

The latter contention has merit in light of the Supreme Court's recent decision in *United States v. Booker*, ── U.S. ──, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (*"Booker/Fanfan"*), holding that, to eliminate Sixth Amendment error, the Guidelines must be deemed advisory rather than mandatory. We note, however, that, because we are vacating one of the counts of conviction, we would ordinarily remand for further proceedings and resentencing even without *Booker/Fanfan*, *see, e.g., United States v. Laljie*, 184 F.3d 180 (2d Cir.1999); *see generally United States v. Quintieri*, 306 F.3d 1217, 1227–28 (2d Cir.2002) ("[a] district court's sentence is based on the constellation of offenses for which the defendant was convicted," and "[w]hen the conviction on one or more charges is overturned on appeal . . ., the constellation of offenses of conviction has been changed"), and we will follow that course in this case.

As discussed in this Court's post-*Booker/Fanfan* decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005), although the Guidelines are no longer mandatory, a sentencing court is nonetheless required to consider the relevant guidelines provisions in determining a reasonable sentence. Accordingly, for the guidance of the district court's sentencing considerations on remand, we address Milstein's challenges on this appeal to the district court's interpretation of the vulnerable-victim and loss guidelines.

### A. *Vulnerable Victim*

 A District Court may enhance the sentence of a defendant if the defendant

"knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1. Application Note 1 to this guideline provides that this "adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure . . . ."

In this case, Milstein chose to distribute counterfeit and misbranded drugs to doctors, pharmacists, and pharmaceutical wholesalers, knowing that those customers would distribute the drugs to women with fertility problems and to Parkinson's disease patients. We see no error in the District Court's view that victims with fertility problems and/or with Parkinson's disease are particularly vulnerable in this context.

B. *Loss Calculation*

■ Under the Guidelines, a defendant's sentence in a case involving fraud is to be calculated in part with reference to the amount of loss inflicted as a result of the offense. *See* U.S.S.G. § 2F1.1(b)(1). Loss for these purposes includes "the actual, probable, or intended loss to victims of the fraud." *United States v. Chatterji*, 46 F.3d 1336, 1340 (4th Cir.1995); *see, e.g., United States v. Brach*, 942 F.2d 141, 143 (2d Cir.1991). Although Milstein contends that the District Court should have not have calculated the loss caused by his offenses without giving him credit for the value of the products consumers received, citing *United States v. Maurello*, 76 F.3d 1304 (3d Cir.1996) (services of disbarred lawyer have some value), and *United States v. Prigmore*, No. CR. 93–10276–JLT, 1996 WL 464030 (D. Mass. Aug 7, 1996) (heart catheter lacking FDA approval has some value), no such credit was required here. The district court may permissibly reason that contaminated medicine is worthless to the consumer. *See, e.g., United States v. Gonzalez–Alvarez*, 277 F.3d 73, 77–80 (1st Cir.2002) (adulterated milk, which "cannot be sold lawfully[,] . . . has a value of zero"); *see also United States v. Bhutani*, 266 F.3d 661, 669–70 (7th Cir.2001) (where "consumers bought drugs under the false belief that they were in full compliance with the law," district court may appropriately determine that "the defendant's gain is the appropriate measure of th[eir] loss").

In the present case, the District Court found that the "loss" suffered by the victims was $4.1 million, based on the sales figures for the prescription drugs that Milstein and his co-conspirators sold during the period of 1991–93. This determination properly reflected the Guidelines as they were applicable to Milstein, and as they were later clarified. The clarification, adopted with a reformulation of the fraud guidelines in 2001, states as follows:

> In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

U.S.S.G. § 2B1.1, Application Note 2(F)(v)(2001). Although this clarification may not be directly applicable to the present case, as it was adopted after Milstein was sentenced, it clarified the law as it stood when Milstein was sentenced. We see no error in the district court's interpretation of the guidelines concerning the calculation of loss.

## CONCLUSION

We have considered all of Milstein's contentions on this appeal and, except as indicated above, have found no basis for reversal. We AFFIRM the convictions on Counts One, Two, Four, and Five. We VACATE the judgment of conviction on Count Three, and we REMAND to the District Court for further proceedings on Count Three, should the Government decide to reprosecute, and for resentencing in accordance with the foregoing.