Affirmed in part, vacated in part, and remanded by published opinion. Judge AGEE wrote the majority opinion, in which Judge FLOYD joined. Judge WYNN wrote an opinion concurring in part and dissenting in part.
*201 OPINION
AGEE, Circuit Judge:
Donald Cone and Chun-Yu Zhao were convicted of various charges under an indictment arising out of a scheme to import and resell counterfeit pieces of computer networking equipment, some of which bore the trademark of Cisco Systems, Inc. (“Cisco”). On appeal, they challenge certain evidentiary rulings made at their joint trial and whether some of the criminal acts alleged can support a conviction for criminal counterfeiting under 18 U.S.C. § 2320. Additionally, Cone challenges whether sufficient evidence supports his conviction for conspiracy and Zhao challenges the sufficiency of the evidence on certain substantive counts upon which she was convicted. For the reasons set forth below, we reject Zhao and Cone’s attack on -the district court’s evidentiary rulings and Cone’s argument that his conviction was not supported by sufficient evidence. However, the government’s theory of prosecution based on a “material alteration” theory of counterfeiting trademarks is not cognizable under the criminal counterfeiting statute based on the facts of this case. Further, the government’s evidence on Count 10 was insufficient as a matter of law to sustain Zhao’s conviction. We therefore vacate the judgment of the district court on certain counts of conviction, affirm the judgment of the district court in all other respects, and remand for resentencing.
I.
Background and Material Proceedings Below
A. The Factual Background
Zhao, then a recent immigrant from the People’s Republic of China (“China”), was recently divorced from Junling Yang, an indicted co-conspirator in this case who remains at large, when she married Cone.[1] While living and working in the United States, Zhao and Cone formed JDC Networking, Inc. (“JDC”), a licensed distributor of products made by and for Cisco. JDC conducted frequent business with a company known as Han Tong Technology (“Han Tong”), a Hong Kong-based business alleged to be operated by members of Zhao’s family. As a Cisco “registered partner,” JDC was contractually prohibited from purchasing Cisco products for resale from outside of the United States, yet records introduced at trial reflect that, from 2004 through 2010, JDC imported over 200 shipments from Han Tong and companies associated with Han Tong in China containing both genuine Cisco products and fake imitations.
In 2005 and 2006, while Zhao and Cone were living together in Rockville, Maryland, U.S. Customs and Border Patrol (“CBP”) agents began intercepting and seizing shipments of highly sophisticated counterfeit computer networking products sent from Han Tong to “Lucy” and “Donald,” at addresses in Rockville,. Maryland. The investigation went cold, however, when the shipper of the counterfeit goods began declaring a very low value for the goods shipped and using variant spellings of the destination address, thus foiling CBP’s tracking techniques.
From 2004 to 2010, JDC marketed computer equipment bearing a Cisco mark to consumers and resale outlets. Several of JDC’s customers, however, were dissatisfied with some of the products they purchased from JDC. E-mails introduced at trial from JDC customers revealed that some clients believed they had been sold counterfeit or fake products.
*202 Zhao filed income tax returns indicating that JDC was struggling and that she was only earning a small salary. In fact, JDC was thriving and producing significant income for her. JDC records reflect that it was purchasing Cisco products (or purported Cisco products) in China for resale at considerably below the expected market price for such products and then reselling the products with a high markup.
As JDC thrived, however, Zhao’s marriage to Cone deteriorated. In late 2007, Cone moved out of the couplé’s home, and Zhao moved into a condominium with her ex-husband Yang. Upset with Zhao over their faltering marriage, Cone sent Zhao a series of e-mails demanding his share of JDC proceeds. In one, he stated “I won’t let my life get ruined. I will make sure everyone knows the truth about everything. IRS, DOJ, Customs, Immigration, et cetera.... I have proof of everything.” (J.A. 1651.) In another e-mail, Cone indicated that “other companies were returning products to us because they were counterfeit;” (J.A. 1653.) Zhao and Cone later divorced.
In 2010, CBP was notified that four pieces of “highly sophisticated, very expensive” counterfeit networking technology (“routers”) bearing Cisco marks were seized upon entry from China into the United States, bound for a Parcel Plus retail storefront in Northern Virginia and with an estimated value of thousands of dollars per piece of equipment. CBP agents compared the attributes of this shipment with those in the 2005-06 investigation and concluded that the 2010 shipments were similar and likely related to the same counterfeiting scheme.
Coordinating its efforts with DHL (a shipping company) and Immigration and Customs Enforcement (“ICE”), CBP intercepted the next package sent from China to the address in Virginia. When CBP and ICE agents opened the package, they discovered over 300 labels bearing a Cisco mark that agents suspected to be counterfeit. CBP and ICE forwarded the package to an ICE facility in Washington, where agents coordinated a controlled delivery of the package to the Parcel Plus retail storefront. Agents observed Zhao retrieving the package and followed her to her home. CBP and ICE agents then executed an anticipatory search warrant at the residence.
In the course of searching Zhao’s home, federal agents discovered, in addition to the shipment of suspected counterfeit Cisco labels that led them to Zhao, unlabeled transceivers that matched the labels found in the shipment, labeled transceivers, business and financial records, torn labels and label backing, and instructions on how to convert Cisco equipment into different models.
As investigators were executing the search warrant at Zhao’s home, a FedEx delivery driver attempted to deliver two packages to her. The delivery driver revealed to the agents executing the warrant that Zhao maintained a storage unit across the street. Although Zhao initially denied the existence of the storage unit (and later provided law enforcement agents with a false unit number and a false entry code to the storage facility), agents were eventually able to gain access. Agents found quantities of boxes filled with equipment bearing a Cisco mark filling “at least half’ the storage unit. (J.A. 614.)
After being arrested, Zhao was interviewed by ICE Agent Julie Hilario for approximately 45 minutes. Although Zhao initially denied any involvement with counterfeiting (and even denied receiving the package that was the subject of the controlled delivery), she eventually admitted that she sold “fake” Cisco products to *203 make a greater profit than with a legitimate product.
As ICE and CBP pursued the investigation, agents interviewed Cone by telephone (he had left the United States and was living in China). Cone admitted that JDC received and resold both real and counterfeit Cisco products from Han Tong (which he described as a “fake” company). (Vol. V J.A. 1990.) With respect to “authentic” Cisco products, Cone informed agents that he and Zhao altered authentic Cisco products obtained from China and sold them to clients, representing that they were higher end products than they actually were. Cone was later arrested when he returned from China in December 2010.
B. District Court Proceedings
Cone and Zhao were both indicted by a grand jury (along with Yang and. Chun-Yan Zhao, defendant Zhao’s sister) in 2010 in the United States District Court for the Eastern District of Virginia on one count of conspiracy in violation of 18 U.S.C. § 371, with three objects: (1) trafficking in counterfeit goods and labels; (2) importation and sale of improperly declared goods; and (3) wire fraud (Count 1); and three counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 16-17, 23).[2]
As relevant to that part of the Count 1 conspiracy charge alleging trafficking in counterfeit goods and labels, the government presented at trial three theories underlying the alleged objects of that conspiracy. First, that some of the products seized from Zhao’s residence or sold to end-users were represented to be Cisco products but in fact were “pure” counterfeits (i.e., the products were never made by or for Cisco). Second, other products (acquired from legitimate Cisco resellers in the United States and abroad) were indeed made by or for Cisco, but were, converted by Zhao and Cone into a different type of Cisco product and represented to buyers as the original of that item (the “material alteration” theory). Third, other products acquired from China that were originally made by or for Cisco but were relabeled and mislabeled by Zhao and Cone with new serial numbers to deceive customers into believing that the products were eligible for Cisco warranty and services in the United States, when, in fact, such products were not so eligible.[3]
In support of Count 8 (counterfeiting) the government introduced testimony from its expert, Cisco engineer Michael Hei-decker, who testified that the four routers seized by CBP in 2010 each contained a unique Cisco “MAC address,” but that the MAC addresses found on the routers were *204 actually assigned to other Cisco products. Thus, Heidecker was able to establish that the four routers were not actually manufactured by Cisco. Furthermore, they were shipped in packaging- that, although displaying a Cisco mark, was, according to Heidecker, counterfeit. Defense expert Richard Krebs, however, opined that the routers were manufactured by or for Cisco, because the MAC addresses for each were actually consistent with the MAC addresses assigned to Cisco-and because counterfeiters could not have created the switches due to the prohibitive cost.
Craig Grant, a manager at Vology, a Cisco equipment reseller, testified regarding Cisco-marked transceivers that are the subject of Count 10 (counterfeiting). Grant testified that Vology purchased ten Cisco transceivers from JDC, but returned them to JDC because Vology was unable to verify the transceivers’ authenticity. Specifically, Grant stated that the Vology inventory team noted that the transceivers were not packaged in standard Cisco packaging. The exact items JDC sold to Volo-gy were not available at trial (having been returned to JDC and resold). Heidecker told the jury that Cisco does not sell unlabeled transceivers and packages them in a certain specific manner not followed in the case of Vology.
During the government’s case in chief, Zhao lodged timely objections to several items of evidence. First, Zhao moved to exclude statements made by Cone which she argued incriminated her and therefore required exclusion under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that admission of a statement inculpating a co-defendant in a joint trial violates the co-defendant’s rights under the Confrontation Clause). The district court denied the motion, although it did require the government to excise any mention of Zhao’s name when Cone’s statements were presented to the jury and replace her name with a gender-neutral noun. The court reasoned that “there are multiple individuals involved [in the conspiracy]” and therefore, Zhao’s rights under the Confrontation Clause would not be prejudiced by use of a gender-neutral substitute. Accordingly, when Cone’s statements were read into evidence, “another individual” was substituted for Zhao’s name.
Zhao also filed a motion in limine to exclude e-mails from JDC customers characterizing certain Cisco products purchased from JDC as “fake” or “counterfeit.” She argued that the e-mails constituted inadmissible hearsay. The district court denied the motion on the grounds that the e-mails were to be admitted not for their truth, but rather, as evidence that Zhao and Cone were on notice that the products JDC sold were not authentic. After the e-mails were introduced at trial, Zhao requested a limiting instruction from the court that the e-mail statements were not to be considered by the jury for their truth. The court replied as follows but did not give the requested limiting instruction.
I believe I’ve said that multiple times to the jury. I’ll say it again. The jury is going to decide what is counterfeit or not. They make up the definition. The' e-mails say what they say, and the jury will have to decide if they’re believable or not. That’s their job.
(J.A. 1673-74.)
At the close of the evidence, Cone moved pursuant to Federal Rule of Criminal Procedure 29 for judgment of acquittal on the charges against him. The district court granted the motion with respect to the wire fraud counts (16-17, 23), granted it in part to the extent that Count 1 (conspiracy) related to wire fraud, but denied the motion for the remainder of Count 1 *205 charging a counterfeiting and importation of misdeclared goods conspiracy. ■
Zhao similarly filed a Rule 29 motion as to all of the wire fraud counts, as well as a motion to dismiss Counts 1 through 6 (the conspiracy charge and the improperly declared goods charges). The district court granted the motion with respect to the wire fraud charges and denied it in all other respects.[4]
In denying the Rule 29 motions on the remaining counts, the district court briefly discussed Cone and Zhao’s argument that the government’s “material alteration” theory exceeded the scope of the federal criminal counterfeiting statute. The court reasoned:
the issue of whether the marks appear on the' serial numbers and the various labels including barcodes are encompassed in the definition [of spurious mark] because labels are being applied to Cisco products to give the end[ ]user an impression that the goods that were of a higher grade than when they originated from the factory....
The statute has to be interpreted in the light of the meaning, and the presentation of an item as new when it has been altered under a mark is likely to cause confusion and lead the consumer to believe the product was made by the genuine owner of the trademark in the fashion in which it left the factory even though it was not.
(J.A. 2344.)
The jury returned a mixed verdict, convicting Cone of conspiracy (the only remaining charge against him), convicting Zhao of conspiracy, all four improperly declared goods charges, all four trafficking in counterfeit goods and labels charges, two counts of money laundering, one count of making a monetary transaction with criminally derived proceeds, and three charges not relevant to this appeal. Zhao was acquitted on one false statement to law enforcement charge and one money laundering charge.
The district court imposed a thirty-month sentence upon Cone and a sixty-month sentence upon Zhao. Both noted timely appeals and we have jurisdiction pursuant to 28 U.S.C. § 1291.
II.
A. Counterfeiting Charges
1. “Material Alteration” as Counterfeiting a Mark Under 18 U.S.C. § 2320
Zhao and Cone raise a pointed challenge on appeal to their convictions under Count 1 (conspiracy to counterfeit) and by Zhao on the underlying substantive counterfeit charge in Count 9. Their argument is that material alteration, one of the government’s theories of criminal liability under the federal criminal counterfeiting statute, 18 U.S.C. § 2320 (2011, West 2012)[5] is not a crime as defined by that statute.
We emphasize at the outset of our analysis, as we noted earlier, that the government alleged several distinct activities as separate acts of counterfeiting (and similarly types of conspiracies to counterfeit). In Count 7, for example, the government alleged that the Cisco labels found in Zhao’s home and storage locker were completely fake, that is, never manufactured by or for Cisco resulting in “pure” counterfeit labels. As we explain below, that act *206 of counterfeiting is plainly cognizable as violating § 2320. What Zhao and Cone challenge is the government’s theory of prosecution for “material alteration” counterfeiting. That is, the government contends § 2320 counterfeiting of marks includes-transactions in which a good bears a genuine and authentic mark, but is altered to be a different product than the one to which the mark was originally fixed. Cone and Zhao not surprisingly disagree with the government and argue that “the [criminal counterfeiting] statute eliminates from the universe of ‘counterfeit marks’ any mark that was placed on a good by its authorized manufacturer and confirms that goods that have been marked in that fashion are not ‘counterfeit.’ ” Opening Br. of Appellants at 25.[6] As the statute is written, we conclude that Cone and Zhao have the better argument.
Where, as here, we are asked to interpret the language of a criminal statute, we are guided by the relevant canons of construction.
“The starting point for any issue of statutory interpretation ... is the language of the statute itself.” “In that regard, we must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute ... and our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.” “We determine the ‘plainness or ambiguity of statutory language ... by reference to the language itself, the specific context in which that language is used, and the'broader context of the statute as a whole.’ ”
Ignacio v. United States, 674 F.3d 252, 254 (4th Cir.2012) (citations omitted). In interpreting a criminal statute, we must be certain that its language clearly identifies the act which is rendered a trespass of the law. “[I]n the interest of providing fair warning of what the law intends to do if a certain line is passed, we will construe ... criminal statute[s] strictly and avoid interpretations not clearly warranted by the text.” WEC Carolina Energy Solutions LLC v. Miller, 687 F.3d 199, 204 (4th Cir.2012) (internal quotation marks and citations omitted).
We look first, therefore, to the plain language of the statute. Under § 2320(a) the act made a crime is defined, in relevant part, as “intentionally traffic[king] or attempting] to traffic in goods or services and knowingly us[ing] a counterfeit mark on or in connection with such goods or services” and “intentionally traffic[king] or attempting] to traffic in labels, ... boxes, containers, ... or packaging of any type or nature, knowing that a counterfeit mark has been applied thereto, the use of which is likely to cause confusion, to cause mistake, or to deceive.” Put succinctly, to obtain a conviction under § 2320(a), the government was required to prove that Cone and Zhao “(1) trafficked or attempted to traffic in goods or services; (2) did so intentionally; (3) used a counterfeit mark on or in connection with such goods and services; and (4) knew the mark was counterfeit.” United States v. Lam, 677 F.3d 190, 197-98 (4th Cir.2012) (quoting United States v. Habegger, 370 F.3d 441, 444 (4th Cir.2004)) (internal quotation marks omitted).
The key issue regarding the material alteration theory is what constitutes a “counterfeit mark” under the statute. A “counterfeit mark” is defined in *207 § 2320(e)(1) as “a spurious mark.” That is, a.tradémark used in connection with goods or labels, “that is identical with, or substantially indistinguishable from, a [registered] mark ... the use of which is likely to cause confusion, to cause mistake, or to deceive.” Id. § 2320(e)(l)(A)(i). The statute provides no further definition of what constitutes a “spurious” mark; however, we recently relied on the definition provid-, ed by Black’s Law Dictionary to define the term as “deceptively suggesting an erroneous origin; fake.” Lam, 677 F.3d at 202 (quoting Black’s Law Dictionary, 1533 (9th ed. 2009) (brackets omitted)).
In order to subject a defendant to criminal liability under § 2320, the government must therefore show that the defendant knowingly trafficked in goods or labels bearing a spurious mark. The requirement of a spurious mark is problematic for the government’s “material alteration” theory that Cone and Zhao obtained a genuine Cisco product bearing a genuine mark; modified the product, but not the mark; then sold the modified product bearing the genuine mark. The government’s contention is that the modification (the material alteration) of the Cisco product to something other than the exact device Cisco originally manufactured transforms not only the genuine product into a counterfeit product but also the genuine mark into a spurious mark. We do not find that § 2320 can be properly read as the government contends without rewriting the statute: an act the Congress, but not this court, can undertake.
The concept put forth by the government, that product modification can transform an unaltered genuine mark into a spurious one, does not appear in the plain language of § 2320, and is not “clearly warranted by the text” of that statute. See Crandon v. United States, 494 U.S. 152, 160, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). Indeed, Congress could have explicitly criminalized in § 2320 the practice of modifying genuine goods that bear a genuine, unaltered mark, but it did not do so. Rather, Congress made criminal the practice of “using a counterfeit mark” in connection with “trafficking] of goods or services,” and “trafficking” in containers and labels with knowledge “that a counterfeit [i.e., fake] mark has been applied thereto.” See 18 U.S.C. § 2320(a). Congress has simply not criminalized in § 2320 the acts that the defendants are accused of committing under the material alteration theory in this case: altering a product with a genuine mark but not altering the mark.
While we are confident that the text of § 2320(a), standing on its own, does not support the government’s material alteration counterfeit theory, our conclusion is significantly bolstered by the existence of the so-called “authorized use” exception found at § 2320(e)(1)(B). That subsection provides that:
such term [“counterfeit mark”] does not include any mark or designation used in connection with goods or services ... of which the manufacturer or producer was, at the time of the manufacture or production in question, authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.
18 U.S.C. § 2320(e)(1)(B).
This subsection makes clear that Congress did not intend to criminalize, in the statute it adopted, the use of genuine and unaltered marks on goods that were manufactured by or for the mark holder. As one commentator has explained, “[a] plain reading and literal interpretation- of [the authorized use exclusion] excludes from [the statute’s] definition of counterfeit goods those products which have their *208 genesis in authorized production.” Brian J. Kearney, Note, The Trademark Counterfeiting Act of 198£: ■ A Sensible Legislative Response to the Ills of Commercial Counterfeiting, 14 Fordham Urb. L.J. 115, 142 n.154 (1986).
Our conclusion rejecting the government’s material alteration theory is further underscored by the novelty of the material alteration approach as posited by the government. Indeed, the government cites no case, and we can identify none, where a criminal conviction under the counterfeiting statute has been sustained for the type of “material alteration” conduct alleged here. The cases the government does cite are significantly distinguishable.
The government asks us to follow United States v. Milstein, 401 F.3d 53 (2d Cir.2005), a case in which' the Second Circuit affirmed the counterfeiting conviction of a defendant accused of purchasing drugs manufactured for foreign markets, repackaging them for sale in the "United States without the consent of the manufacturers, and representing to the public that the drugs were FDA approved when they were not. Id. at 62. Milstein, however, is inapposite because the defendant “obscured the fact that the drugs had been repackaged, and, with his package design, fraudulently conveyed that the foreign drugs had been manufactured as FDA-approved products.” Id. at 63. The Mil-stein defendant manufactured counterfeit packaging “designed to resemble ... authentic packaging.” Id. In this case, by contrast, the Cisco mark was and remained a genuine mark. Milstein, which involved an actual spurious, i.e., fake mark, provides no support for the proposition that genuine marks can lose.their genuine character by virtue of alteration only of the good to which the mark was correctly attached when that good was produced.
The government also relies on United States v. Farmer, 370 F.3d 435 (4th Cir.2004), for the proposition that because after-market alteration removes a measure of quality assurance from the original manufacturer, marketing the altered products as genuine is prohibited under § 2320(a). In Farmer, this court upheld the counterfeiting conviction of a defendant accused of “purchasing blank t-shirts and sweatshirts manufactured for companies like Nike and Hilfíger, placing those companies’ logos on the shirts without authorization, and then passing along the shirts to the public as brand-name goods.” Id. at 436. The defendant in that case purchased authentic shirts from authorized manufacturers, and then affixed the unauthorized brand-name mark to represent the good as being brand-name marked.
Farmer, however, is materially different from the case at bar. Critically, the mark that was affixed to the goods at issue was not genuine, being fraudulently affixed by the defendant himself, thereby rendering the mark a “spurious mark.” In contrast to the marks genuinely affixed by Cisco to the goods before being acquired by JDC, the placement of the marks in Farmer was never authorized by the manufacturer at any time during the manufacture of the goods in question. See id. at 440 (“[i]t was Farmer rather than the trademark holder who oversaw the construction of the shirts.”). Farmer therefore does not support the government’s material alteration theory of counterfeiting that genuine marks lose their genuine character solely from product alteration.
Additionally, the government argues that we should adopt, for purposes of the criminal counterfeiting statute, certain trademark applications under the Lanham Act, 15 U.S.C. § 1051 et seq., the statute *209 governing civil trademark disputes.[7] The government argues that cases under the Lanham Act support the proposition that a genuine mark becomes counterfeit when the product is altered in a way not approved by the original manufacturer. See Intel Corp. v. Terabyte Int’l, Inc., 6 F.3d 614, 620 (9th Cir.1993) (“by the time the Intel markings had been scraped off or printed over, Intel did make the chip but it was no longer the source of the product which was being sold.”).
As the government correctly notes, we recently stated that, “[b]ecause of the similarity between [the Lanham Act] definition [of counterfeit] and the § 2320 definition of ‘counterfeit mark,’ we find Lanham Act civil counterfeiting cases helpful to our analysis of criminal counterfeiting cases brought under § 2320(a).” Lam, 677 F.3d at 199 n. 8.[8] Helpful though these cases may be, it does not necessarily follow that we import every aspect of civil counterfeiting jurisprudence into the criminal counterfeiting context. Indeed, as we recognized in Lam, “the standard may ‘be construed more narrowly in a criminal context than in a civil context.’ ” Id. (quoting United States v. Guerra, 293 F.3d 1279, 1288 (11th Cir.2002)).
As a number of courts have recognized, § 2320 must be construed more narrowly than the civil law definition of counterfeit acts contained in the Lanham Act. See United States v. Giles, 213 F.3d 1247, 1250 (10th Cir.2000) (“[W]e must construe [the criminal counterfeiting statute more] narrowly [than the Lanham Act].”); United States v. Hanafy, 302 F.3d 485, 489 (5th Cir.2002) (“Lanham Act precedent is of little value in a § 2320 case because the Lanham Act deals with civil liability.”) (citing Giles, 213 F.3d at 1250); Guerra, 293 F.3d at 1288 (“The ‘identical or substantially indistinguishable’ standard [in the counterfeit context] is to be construed more narrowly in a criminal context than in a civil context.”).
Indeed, even the civil cases to have found Lanham Act liability based on material alteration have acknowledged that such a theory of liability strays from a strict statutory definition of “counterfeit.” See Rolex Watch USA, 158 F.3d at 826 (“The original ... labels are not themselves ‘counterfeits’ in the literal sense.”) (quoting Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 899 (9th Cir.1997)). In doing so, those courts relied upon a rationale critical in the civil trademark infringement context: “the important test is whether the practice of the defendant is likely to cause confusion, not whether the defendant duplicated the plaintiffs mark.” Westinghouse, 106 F.3d at 899 (citing Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857, 861 (5th Cir.1967) (“Confusion, or the likelihood of confusion ... is the real test of trademark infringement.”)). . In applying a criminal statute, *210 however, we do not have the freedom to disregard an element of the crime: that the defendant did, in fact, employ a counterfeit mark. See 18 U.S.C. § 2320(a).
Moreover, Zhao and Cone have correctly identified a second material difference between the Lanham Act and § 2320: the Lanham Act lacks an authorized use exception. Thus, our conclusion that under the § 2320(e)(1)(B) authorized use exception Congress did not intend to criminalize the use of genuine marks used on goods that were manufactured by or for the mark holder distinguishes this case from those civil cases cited by the government. No court, in interpreting the Lanham Act to allow material alteration liability, has even had the opportunity to opine oh whether an authorized use exception (such as that codified at § 2320(e)(1)(B)), would preclude such liability in the civil context of trademark infringement.
For all the reasons just discussed, we find that criminal liability under § 2320 cannot be based on the alteration of a product to which a genuine mark was affixed and the mark itself has not been altered. The Congress can certainly rewrite that statute to cover a material alteration theory, but the statute as now written does not do so. , , '
We must now apply our holding on the scope of § 2320 to the facts of this case and determine what, if any relief is available to Cone and Zhao. Based on our review of the indictment, and the evidence adduced at trial, we first conclude that Zhao’s conviction under Count 9, a substantive counterfeiting charge against her, must be vacated.
Count 9 charged Zhao with, “on June 16, 2010, ... intentionally trafficking] in ... a counterfeit Cisco unit.” (J.A. 74.) The evidence adduced at trial showed that-in 2010 the U.S. Fish and Wildlife Service (“FWS”) purchased an “enhanced” Cisco switch from Memorydealers.com, which in turn had purchased the switch from JDC. When the switch arrived, officials at FWS became aware that they had received a “standard” model, rather than the enhanced version they had purchased. The MAC address[9] of the switch was assigned to a standard model, while the serial number on the chassis was assigned to an “enhanced” switch. Thus, the government adduced evidence that a standard model switch was purchased from Cisco, which had a proper and genuine Cisco mark affixed to it. Zhao, through JDC, later upgraded the product to resemble an enhanced model switch, and sold it to Memorydealers.com as an enhanced switch. The mark, however, was genuinely affixed to the good when manufactured by or for Cisco and the mark itself was never altered. That conduct is not, we conclude, criminal counterfeiting because the unaltered genuine mark is not a spurious mark, a required element of the crime under § 2320. Thus, Zhao’s conviction for Count 9 cannot stand and must be vacated.
Cone and Zhao argue that their convictions for conspiracy under Count 1 must also be vacated. This is so, they contend, because the jury’s verdict was a general one and it is impossible to determine whether the conspiracy convictions rested upon the invalid material alteration theory as opposed to the valid theory of improperly declared goods also charged under Count 1.
*211 Zhao and Cone are correct to state that “reversal is required when a case is submitted to a jury on two or more alternate theories, one of which is legally (as opposed to factually) inadequate, the jury returns a general verdict, and it is impossible to discern the basis on which the jury actually rested its verdict.” United States v. Moye, 454 F.3d 390, 400 n. 10 (4th Cir.2006) (en banc) (citing Yates v. United States, 354 U.S. 298, 311-12, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)).
In this case, however, the jury returned a special, not a general verdict as to Count 1. Indeed, the jury was given and utilized, without objection, a special verdict form. On that verdict form the jury found Cone and Zhao guilty of conspiracy to traffic in counterfeit goods and labels, and separately found them guilty of conspiracy to import and sell improperly declared goods. We recently addressed a similar situation in United States v. Lawson, 677 F.3d 629 (4th Cir.2012). In that case, after determining that certain juror misconduct rendered a conviction for conspiracy to violate the Animal Welfare Act invalid, we determined whether the defendants’ convictions for a single count of conspiracy could nevertheless be affirmed where the indictment alleged a multi-object conspiracy in the conjunctive. We reasoned that
in contrast to the general verdict rendered in Yates, the verdict in the present case reveals that the jury had two separate bases for convicting the ... defendants of the conspiracy charges. Although the indictment alleged both objects in a single count, the jury’s verdict forms with respect to each of the ... defendants listed separate guilty verdicts for “Count 1—Conspiracy (Animal Welfare Act: June 18, 2008 through April 18, 2009)” and “Count 1—Conspir-acy (illegal gambling business: May 2007 through April 18, 2009).” Thus, we are not confronted with a situation in which we are uncertain whether a jury’s verdict was solely attributable to an underlying conviction which we have set aside on legal grounds. Cf. Yates, 354 U.S. at 311-12, 77 S.Ct. 1064. Accordingly, the conspiracy convictions for the ... defendants are supported by a valid and independent legal basis that is apparent from the record, and we therefore affirm those convictions.
Id. at 655. Likewise, the conspiracy convictions in this case are supported by a “valid and independent legal basis,” id., because of the separate verdict form, and we accordingly affirm the conspiracy convictions of both Cone and Zhao.[10]
Our review of the presentence investigation report (“PSR”) and the record of the sentencing hearing, however, plainly demonstrates that the district court relied on the counterfeiting object of the conspiracy convictions in fashioning the sentences for Cone and Zhao. Because the district court may have utilized what we have now determined would be noncriminal acts under the material alteration theory of counterfeiting conspiracy in arriving at the sentences, we must also vacate the sentences of both Cone and Zhao and remand for resentenc-ing.
B. Sufficiency of the Evidence
i. Counts 8 and 10 against Zhao
In addition to her challenges to Count 1 and Count 9, Zhao also argues that Counts 8 and 10 should be vacated because the *212 evidence was insufficient, as a matter of law, to prove that she engaged in § 2320 criminal counterfeiting. We agree with Zhao as to Count 10, but not Count 8.
“A defendant challenging the sufficiency of the evidence faces a heavy burden.” United States v. Foster, 507 F.3d 233, 245 (4th Cir.2007). In a sufficiency of the evidence challenge, we view the evidence on appeal in the light most favorable to the government in determining whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. United States v. Collins, 412 F.3d 515, 519 (4th Cir.2005). We review both direct and circumstantial evidence, and accord the government all reasonable inferences from the facts shown to those sought to be established. United States v. Harvey, 532 F.3d 326, 333 (4th Cir.2008). We do not review the credibility of the witnesses and assume that the jury resolved all contradictions in the testimony in favor of the government. United States v. Kelly, 510 F.3d 433, 440 (4th Cir.2007).. We will uphold the jury’s verdict if substantial evidence supports it and will reverse only in those rare cases of clear failure, by the prosecution. Foster, 50.7 F.3d at 244-45.
With respect to the products at issue in Count 8, four routers seized by CBP in 2010, prosecution expert and Cisco engineer Michael Heidecker opined that the MAC addresses found on the routers matched physically different products manufactured by Cisco. (See J.A. 1052-54.) Furthermore, Heidecker opined that the labels applied to the routers were non-genuine. Thus, Heidecker was able to conclude that the routers at issue were not manufactured by or for Cisco and could not be genuinely marked. While Zhao’s expert reached a different conclusion, this conflicting evidence was for a jury to weigh. The jury had ample evidence. on which to conclude that Zhao was guilty as charged in Count 8.
On Count 10, however, the Government did not carry its burden to show that Zhao engaged in the criminal counterfeiting of marks. Count 10 charges that JDC sold counterfeit Cisco transceivers to Vology, a reseller of network equipment. The government alleges that these transceivers were not made by or for Cisco, but identifies only two pieces of evidence in support of this claim.
First, the government points to testimony from Craig Grant, a Vology manager, who testified that, upon receipt of the transceivers, he was able to tell from his experience that the packaging was not genuine. Congress, however, has chosen to bar the government from bringing “a criminal cause of action ... for the repackaging of genuine goods or services not intended to deceive or confuse.” 18 U.S.C. § 2320(g). Evidence of repackaging, therefore, is not enough standing alone to prove the goods within that packaging bear a counterfeit mark. The government must come forth with some other evidence that the mark on the actual good is spurious.
To that end, the government’s second piece of evidence for Count 10 is that law enforcement seized “additional versions” of the transceivers at issue in Count 10 from Zhao’s residence, which Heidecker opined were not made by or for Cisco. However, the Vology transceivers were not introduced at trial, having been returned to JDC and resold. Whatever marks the “additional versions” of the transceivers may (or may not) have borne does not prove the status of the marks on the long gone Vology transceivers. No evidence at trial established what marks were on the Vology transceivers; a burden which fell to the government to bear.
*213 Heidecker opined only that the packaging of the transceivers found at Zhao’s home was inauthentic. (J.A. 1024.) He gave no testimony about the marks on the Vology transceivers.
Since the “repackaging” evidence cannot, under the plain terms of § 2320(g), sustain a conviction under the statute for a counterfeit mark on the goods in the package, and as the government adduced no evidence on the marks on the Vology transceivers, the government failed to prove a violation of § 2320 for the acts charged in Count 10. The evidence was insufficient as a matter of law to sustain Zhao’s conviction.
Accordingly, while we find that the government adduced sufficient competent evidence to sustain Zhao’s conviction under Count 8, we find that the government did not do so. with respect to Count 10, and vacate that count of conviction.
ii. Sufficiency of the Evidence Against Cone
Cone individually challenges his conviction for conspiracy to import misdeclared goods (Count 1) by arguing that the evidence was insufficient and the district court accordingly erred in denying his Rule 29 motion for judgment of acquittal. We review the district court’s denial of a Rule 29 motion de novo. Lam, 677 F.3d at 198. The legal standard for a sufficiency of the evidence claim is set forth above at p. 22.
In Count 1, the government alleged Cone participated in a conspiracy to violate 18 U.S.C. § 545, which criminalizes “fraudulently or knowingly importing] or bringfing] into the United States, any merchandise contrary to law.” Id. Cone was alleged to have conspired to import goods without taking reasonable care to ensure that the goods were properly declared, in violation of 19 U.S.C. § 1484(a).
To establish a conspiracy under § 371, the Government must prove “(1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy.” United States v. Ellis, 121 F.3d 908, 922 (4th Cir.1997). “The existence of a tacit or mutual understanding between conspirators is sufficient evidence of a conspiratorial agreement.” Id. (internal quotation marks omitted). Proof of the agreement may be established by circumstantial evidence. Burgos, 94 F.3d at 857. It is no defense to a conspiracy charge that one’s role in the conspiracy is minor. See United States v. Laughman, 618 F.2d 1067, 1076 (4th Cir.1980) (“Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy.” (internal quotation marks omitted)).
United States v. Kingrea, 573 F.3d 186, 195 (4th Cir.2009).
With the standards of review in mind, we have little difficulty concluding that the government adduced sufficient evidence from which the jury could properly convict Cone under Count 1. Cone was unquestionably an active participant in the scheme to sell counterfeit, mislabeled, or undeclared Cisco products. The evidence adduced at trial showed that Cone confessed to law enforcement that he was a member of that conspiracy. He acknowledged in his confession that he was aware that Han Tong employees were misdeclaring goods to avoid detection by CBP. Furthermore, when he became estranged from Zhao, he sent e-mails to her demanding his share of proceeds from the conspiracy.
*214 This is not a case, as Cone suggests, where an innocent spouse is implicated solely by his marriage to a conspirator. See United States v. Dozie, 27 F.3d 95, 98 (4th Cir.1994) (vacating conspiracy conviction against co-defendant’s spouse who “was never tied to the conspiracy by any of the other persons involved”). Rather, the record contains ample evidence from which the jury could have properly concluded that Cone was an active participant in the conspiracy. We accordingly see no merit to Cone’s contention that there was insufficient evidence to support his conviction on Count 1.
iii. Money Laundering
Zhao further contends her convictions for money laundering must be vacated on the basis that the government’s incorrect “material alteration” theory may have formed the basis for her money laundering convictions.[11] We agree.
Zhao was convicted of two counts (Count 27 and 28) of “concealment” money laundering. See 18 U.S.C. § 1956(a)(2)(B)(i); (a)(1)(B)®. She was also convicted of Count 29, engaging in a monetary transaction with criminally derived proceeds in violation of 18 U.S.C. § 1957(a) (collectively “the money laundering convictions”).
To obtain a conviction under § 1956(a)(1)(B)® (Count 28), the government had the burden to prove four elements:
(1) an actual or attempted financial transaction; (2) involving the proceeds of a specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) knowledge that the transaction was designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity.
United States v. Richardson, 658 F.3d 333, 337-38 (3d Cir.2011) (internal quotation marks, brackets, and ellipsis omitted) (emphasis added). The elements of a violation of § 1956(a)(2)(B)®, as charged in Count 27, are similar, with the additional requirement that the government prove an international transaction involving the proceeds of unlawful activity. See Cuellar v. United States, 553 U.S. 550, 553, 128 S.Ct. 1994, 170 L.Ed.2d 942 (2008). Finally, as to Count 29, § 1957(a) similarly requires the government to allege (and prove) a transaction involving funds derived from a specified unlawful activity. See United States v. Cherry, 330 F.3d 658, 668 (4th Cir.2003).
In this case, the district court instructed the jury properly as to each offense, observing that, to sustain a conviction under Counts 27, 28, and 29, the government must prove beyond a reasonable doubt that Zhao engaged in monetary transactions that, inter alia, involved funds derived from the offense of trafficking in counterfeit goods or labels. (See J.A. 2430-37.)
As the Supreme Court has explained,
Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law-whether, for example, the action in question ... fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.
*215 Griffin v. United States, 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). Accordingly, “a verdict [is required] to be set aside in cases where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected.” Yates v. United States, 354 U.S. 298, 312, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). But see United States v. Hastings, 134 F.3d 235, 242 (4th Cir.1998) (“If [the] evidence is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed.”).
While it. is no doubt correct that the government adduced ample evidence tending to show that Zhao committed “pure” counterfeiting, neither the indictment, nor the evidence adduced at trial allow us to conclude that the jury necessarily convicted Zhao of money laundering based on the government’s “pure” counterfeiting theory.
Agent Hilario testified, in support of Count 27, that JDC and Han Tong engaged in a series of wire transfers in June, 2010, designed to conceal the funds’ source. The source of these funds was derived largely, if not entirely, from sales, by JDC, of goods purchased from Han Tong. The evidence of these sales, introduced in the form of Zhao’s ledgers, simply does not allow us to determine whether the sales were of “pure” counterfeits, or of “materially altered” goods, which, as discussed supra, do not constitute counterfeit marks for the purposes of § 2320.
The government’s evidence in support of Count 28 consisted solely of testimony from ICE agent Raymond Orzel, a certified fraud examiner. Orzel testified that Zhao purchased a home in 2005 with funds derived from JDC, Han Tong, and related entities. (J.A. 1520-21.) In 2008, Zhao sold the home to an individual named Dan Lou, (an indicted co-conspirator) who rented the home out. However, the government also put forth evidence that the funds Lou used to purchase the home were drawn from Zhao’s accounts, and that rent checks made out to Lou were deposited in accounts controlled by Zhao. Once again, the funds at issue were derived from JDC sales of Han Tong goods. We cannot say with any certainty that the jury only considered sales of “pure” counterfeits when convicting Zhao of Count 28.
In support of Count 29, the government adduced evidence that Zhao directed that two $50,000 cheeks be drawn from JDC accounts to Mareie Wu, an affiliate of Han Tong. The checks represented, in large part, the proceeds of the sales of certain Cisco switches from JDC to Network Hardware Resale (“NHR”). (See J.A. 1964-66.) These switches were obtained from Han Tong, and the evidence adduced at trial demonstrated that the switches were manufactured by or for Cisco, and then later altered by Zhao. Because this conduct is not criminal counterfeiting, the jury’s verdict of conviction on Count 29 rests on an unsound legal basis.
Thus, the money laundering convictions must be vacated. Count 29 appears to clearly rest on an improper legal basis, and because we cannot say with certainty whether 'Zhao’s convictions on Counts 27 ahd 28 are based on “pure” counterfeiting, those convictions must be vacated as well.
iv.
Our distinguished colleague in dissent concurs in the foregoing analysis concerning the “material alteration” theory, but suggests that Zhao’s conviction on Count 8, a substantive counterfeit charge, should also be vacated. We respect the views of the dissent but do not agree.
The general thesis of the dissent is that, having held that the government’s “materi *216 al alteration” theory of counterfeiting is without legal basis, we should have vacated Count 8 owing to improper closing argument by the government. However, at oral argument, when asked by the panel what specific counts of the indictment would be affected by our rejection of the “material alteration” theory, counsel for Zhao responded that such a holding would “most clearly” affect substantive Count 9 and Count 1 (conspiracy). Audio Recording of Oral Argument at 1:30. Counsel, of course, could have argued.that vacatur of Count 8 was appropriate as well, but chose to focus entirely on Counts 9 and 1. This is not surprising, as the record is conclusively clear that at no point in the district court or this court, did Zhao raise a claim of error under the material alteration theory as to Count 8. This concept arises sua sponte for the first time in the dissent.
The representations of Zhao’s counsel to the panel at oral argument were entirely consistent with the arguments set forth in her briefs before this Court and the district court. Indeed, although Zhao contends that Count 8 should be vacated, her argument rests entirely on a sufficiency of the evidence basis, which we rejected in section II(A)(ii), above. (See Opening Br. of Appellant at 36-38).
.The dissent acknowledges as much, but argues that because the government argued a legally incorrect theory to the jury in closing argument, deference to the jury’s verdict is not warranted. To reach this result, the dissent analyzes the government’s remarks under United States v. Lighty, 616 F.3d 321, 361 (4th Cir.2010). Again, a construct appearing for the first time now, sua sponte, and which, under our precedent, has long since been waived by Zhao.
Zhao never made the argument that is the lynchpin of the dissenting opinion: that the prosecutor’s closing comments, in and of themselves, constitute reversible error. See Post at 228 (“A prosecutor’s comments constitute reversible error if....”). Zhao’s briefs on appeal are utterly devoid of any reference to the Lighty factors because Zhao does not make a standalone challenge to the government’s statements in closing argument. Rather, to the extent that Zhao discusses the prosecutor’s closing arguments at all, it is for purposes of the harmless error analysis under Count 1 only.
Zhao’s failure to raise this independent assignment of error, either in brief or at oral argument, regarding the government’s comments to the jury is fatal to the position advocated by. the dissent. See United States v. Strieper, 666 F.3d 288, 293 n. 4 (4th Cir.2012) (Floyd, J.) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 241 n. 6 (4th Cir.1999)) (“This argument does not appear in [Appellant’s] brief, and as such, it is waived.”). Granting relief on a basis not advanced by Zhao (and arguably disclaimed at oral argument) is plainly improper for all the reasons the rule of waiver is in force. The government has not had any opportunity to respond to the claim of error advanced by the dissent, nor was it ever placed before the district court for' consideration.[12] See Cavallo v. Star Enterprise, 100 F.3d 1150, 1152 n. 2 (4th Cir.1995) (“The [Appellants’] omission of the issue from their initial brief denied [Appellee] an opportunity to respond, so considering it *217 now would, be unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues raised”) (quoting Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir.1995) (internal quotation marks omitted)).
Additionally, we do not consider the issue of the prosecutor’s comments on appeal as they were not preserved by Zhao in the district court. We have long held that the failure to object to a prosecutor’s statements made during closing arguments constitutes a waiver of that claim of error. See United States v. Sawyer, 347 F.2d 372, 374 (4th Cir.1965) (“[I]f defense counsel does not object during the course of the Government’s closing argument he may be said to have waived the point.”).
The mere fact that Zhao challenged, as a general matter, the “material alteration” theory presented by the government is insufficient to preserve the claim of error formulated by the dissent. This is so because, as explained above, the dissent’s theory is based on a stand alone prosecuto-rial misstatement -claim. Indeed, the dissent acknowledges that the theory presented by the prosecution during closing statements “was even broader than the material alteration theory advanced in the government’s’ proposed jury instruction.” Post, at 224. Accordingly, Zhao’s pre-trial challenge to the government’s proposed jury instructions would not preserve a claim of error as to the prosecutor’s unchallenged remarks in closing.
It is for that reason that the dissent’s reliance on Lacy v. CSX Transportation, Inc., 205 W.Va. 630, 520 S.E.2d 418 (1999), is unavailing. In that case, as the dissent observes, the court found that an unsuccessful motion in limine was sufficient to preserve a challenge to later' closing remarks by the opposing party so long as the argument fell within the scope of the court’s earlier ruling on the motion. Id. at 427. In this case, though, as the dissent acknowledges, Zhao succeeded in her motion in limine. It makes sense, therefore, that if the prosecutor’s closing remarks ran afoul of the district court’s prior ruling, Zhao should have timely objected to alert and afford the court an opportunity to correct any error.[13]
The dissent does correctly observe that Zhao’s brief on appeal mentions the government’s closing arguments. But even a superficial reading of the briefs demonstrates thaf, far from raising an independent challenge to the prosecutorial statements, Zhao was merely describing what the prosecutor said, or, in one case, noting that any error in the government’s theory of prosecution was non-harmless. See Appellants’ Br. at 39-40. The dissenting opinion goes several steps farther, raising, for the first time, a stand alone challenge to the prosecutorial remarks.
For those reasons, the cases cited by the dissent in favor of its position are, in our view, inapposite. Judge Floyd’s dissent in Lam, for example, cited twice in the dissenting opinion, observed that “the district court has sustained repeated objections-to the [prosecutorial] statement.” Lam, 677 F.3d at 212. Here, the district court did not sustain any objection because none was made. Thus the government was deprived of the opportunity to make the case that its argument was proper, and the *218 district court was deprived of the opportunity to correct any purported error. See United States v. Hargrove, 625 F.3d 170, 184 (4th Cir.2010) (“Hargrove failed to object ... at the time, thus denying the district court the opportunity to consider Hargrove’s argument and correct the purported error.”).
Accordingly, while we respect the views of the dissent, we do not agree that the claim of error on which the dissent would vacate Count 8 was properly preserved by the Zhao or raised in this court or the district court.
C. Confrontation Clause
Zhao argues that the district court committed reversible error by admitting Cone’s out-of-court statements to Agent Hilario into evidence against her. The core of Zhao’s claim is that substituting “another individual” for her name made it obvious to the jury that she was the person referenced and thereby violated her Sixth Amendment Confrontation Clause rights.
In Bruton, the Supreme Court held: “[A] defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant’s confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.” Richardson v. Marsh, 481 U.S. 200, 201-02, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (citing Bruton v. United States, 391 U.S. 123, 135-36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). This court reviews de novo an evidentiary ruling implicating the Confrontation Clause. United States v. Palacios, 677 F.3d 234, 242 (4th Cir.2012).
In United States v. Akinkoye, 185 F.3d 192 (4th Cir.1999), we summarized Supreme Court precedent as holding that “if a redacted confession of a non-testifying codefendant given to the jury (by testimony or in writing) shows signs of alteration such that it is clear that a particular defendant is implicated, the Sixth Amendment has been violated.” Id. at 197. We further noted that the Supreme Court’s precedent did not directly address the situation in that case&emdash;“namely, whether redacted statements that refer to the existence of another party who may be the defendant through symbols or neutral pronouns are admissible,” and observed that “[t]he Supreme Court has strongly implied that such statements do not offend the Sixth Amendment.” Id. at 198.
In Akinkoye, the co-defendant’s confessions were retyped so as to replace “the defendants’ respective names with the phrase ‘another person’ or ‘another individual.’ ” Id. The retyped versions were read to the jury, and the jury “neither saw nor heard anything in the confessions that directly pointed to the other defendant.” Id. Accordingly, we held that the defendants’ Confrontation Clause rights were not violated by the redacted statements because use of the neutral phrase “another person” did not facially implicate the defendant. Id.
Applying the holding of Akinkoye to the case at bar, we readily conclude that substitution of Zhao’s name with “another individual” was sufficient to protect Zhao’s rights under the Confrontation Clause. The phrase “another individual” does not facially implicate Zhao. Only by reference to other evidence could the jury have arrived at the conclusion that Zhao was the actual subject of Cone’s out of court statement. In such circumstances, we have concluded that the Confrontation Clause is not offended, and thus Zhao’s claim lacks merit.
D. Introduction of Customer E-Mails
Cone and Zhao last argue that the district court erred in admitting certain e *219 mails from JDC customers complaining that JDC products were “counterfeit” and “fake.” Although the district court determined that the e-mails were introduced for a non-hearsay purpose, i.e., to show that Zhao and Cone were on notice that they were selling counterfeit goods, the court declined to give a limiting jury instruction to that effect and instead stated that “the e-mails say what they say and the jury will have to decide if they’re believable or not. That’s their job.” (J.A. 1673-74.) Cone and Zhao contend that the court’s actions constitute reversible error.
This Court reviews evidentiary rulings for an abuse of discretion and “will only overturn an evidentiary ruling that is ‘arbitrary and irrational.’ ” United States v. Cloud, 680 F.3d 396, 401 (4th Cir.2012) (quoting United States v. Cole, 631 F.3d 146, 153 (4th Cir.2011)). Evidentiary rulings are subject to harmless error review, such that any error is harmless where we may say “with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.” United States v. Johnson, 617 F.3d 286, 292 (4th Cir.2010).
At the outset, we believe that the district court properly admitted the e-mails for the non-hearsay purpose of showing that Cone and Zhao were on notice as to the counterfeit nature of the goods they sold. See 5-801 Weinstein’s Federal Evidence § 801.11[5][a] (Out of court statement not hearsay when “offered not for [its] truth but to prove the extent of ... a recipient’s notice of certain conditions.”).
We áre troubled, however, by the court’s response to counsel’s request for a limiting instruction. Indeed, while the e-mails may have been properly admitted for a reason other than their truth, the district court stated just the opposite&emdash;that the jury will have to decide “if theyTe believable or not.”' In other words, the court erroneously instructed the jury to consider statements contained in the e-mails for the truth of the matter asserted.
The government contends, nonetheless, that the court’s statement was not error because the statements in the e-mails could have been admitted under a hearsay exception, namely the business records exception to the hearsay rule, found at Federal Rule of Evidence 803(6). We are not persuaded.
Rule 803(6)(B) allows for the introduction of. records that are “kept in the course of a regularly conducted activity of a business.” For a record to be admitted as a business record, it must be “(1) made by a regularly conducted business activity, (2) kept in the ‘regular course’ of that business, (3) ‘the regular practice of that business to make the memorandum,’. (4) and made by a person with knowledge or from information transmitted by a person with knowledge.” Clark v. City of L.A., 650 F.2d 1033, 1036-37 (9th Cir.1981) (quoting Fed. R.Evid. 803(6)).
E-mails, however, present unique problems of recent vintage in the context of the business records exception. As one district court recently explained:
Courts are in disagreement on whether emails can and should fall under the business records hearsay exception. The business records exception assumes that records containing information necessary in the regular running of a business will be accurate and reliable. See Certain Underwriters at Lloyd’s London v. Sinkovich, 232 F.3d 200, 204-05 (4th Cir.2000). Email, however, is typically a more casual form of communication than other records usually kept in the course of business, such that it may not be appropriate to assume the same degree of accuracy and reliability. As *220 email is more commonly used to communicate business matters both internally and externally, however, more formal paper records are becoming more unusual
It’s My Party, Inc. v. Live Nation, Inc., No. JFM-09-547, 2012 WL 3655470 at *5 (D.Md. Aug. 23, 2012) (unpublished). The district court in that case excluded the emails on the basis that the “more specificity is required regarding the party’s recordkeeping practices to show a particular email in fact constitutes a reliable business record.” Id.
While properly authenticated emails may be admitted into evidence under the business records exception, it would be insufficient to survive a hearsay challenge simply to say that since a business keeps and receives e-mails, then ergo all those emails are business records falling within the ambit of Rule 803(6)(B). “An e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule.” Morisseau v. DLA Piper, 532 F.Supp.2d 595, 621 n. 163 (S.D.N.Y.2008). The district court’s observation that the e-mails were kept as a “regular operation of the business” is simply insufficient on that basis alone to establish a foundation for admission under Rule 803(6)(B). Accordingly, because the e-mails could not, on this record, be admitted under an exception to the hearsay rule, the district court’s failure to give the limiting jury instruction was error.
We conclude, however, that the any error in the court’s jury instructions or failure to give an e-mail limiting instruction was harmless. In the context of a twelve-day jury trial in which the government adduced overwhelming evidence of Cone and Zhao’s guilt, we cannot conclude that Cone or Zhao were prejudiced by this single error concerning a minute portion of the total evidence against them. As discussed above, the government further introduced physical evidence in the form of counterfeit labels seized from Zhao’s home and storage unit. The government also introduced routers seized by CBP, that Heidecker (a Cisco engineer) identified as counterfeit goods.
The government also introduced evidence from Cone and Zhao themselves. In addition to Zhao’s confession at the time of her arrest (that she sold “fake” goods in order to make more money), the government introduced incriminating emails from Cone to Zhao wherein Cone threatened to reveal the counterfeiting scheme to law enforcement if he did not receive his share of proceeds from the criminal venture. In sum, the government’s evidence against Cone and Zhao was more than ample, and we conclude that the district court’s jury instruction with respect to certain e-mails from JDC customers was harmless beyond a reasonable doubt.
III.
Because we conclude that the government’s material alteration theory of counterfeiting is not encompassed within the § 2320 statutory crime of counterfeiting marks, we vacate Zhao’s conviction on Count 9. In light of this holding, we must vacate Zhao’s convictions for Counts 27, 28, and 29. We further hold that the evidence was insufficient as a matter of law to sustain Zhao’s conviction on Count 10 and also vacate that conviction. We also vacate the sentences of both Cone and Zhao and remand for resentencing in light of our holding today. We affirm the judgment of the district court in all other respects.
AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

. Based on the jury's verdict, we recite the facts in the light most favorable to the government. United States v. Cloud, 680 F.3d 396, 399 n. 1 (4th Cir.2012).

. In addition, Zhao was individually indicted on five counts of importation and sale of improperly declared goods in violation of 18 U.S.C. § 545 (Counts 2-6); four counts of trafficking in counterfeit goods and labels in violation of 18 U.S.C. § 2320 (Counts 7-10); three counts of making false statements to federal law enforcement officials in violation of 18 U.S.C. § 1001(a)(2) (Counts 11-13); two counts of false statements in naturalization in violation of 18 U.S.C. § 1425(a) (Counts 14-15); seven individual counts of wire fraud (Counts 18-2, 24-25); three counts of money laundering in violation of 18 U.S.C. § 1956(a) (Count 26-28); and one count of monetary transaction with criminally derived proceeds in violation of 18 U.S.C. § 1957(a) (Count 29).

. For purposes of this appeal, only Counts 1 arid 9 are affected by the second object of the conspiracy, which we address as the material alteration theory. The first and third objects are not at issue on appeal as part of the material alteration theory challenge. The convictions related to the first object, importation of misdeclared goods (and underlying substantive counts) are unaffected by our analysis of the material alteration theory, and the third object, wire fraud, was dismissed by the district court.

. The district court also dismissed Count 15, false statements in naturalization, on the government's motion.

. Section 2320 has been amended in 2011 and 2012. We cite to the prior version of the statute which was the version in effect during all times relevant to this appeal.

. Zhao and Cone argue, in the alternative, that § 2320 would be unconstitutionally vague if applied to them in the context of material alteration counterfeiting. Because we agree that the material alteration theory of criminal counterfeit lacks statutory foundation, we do not address their alternative vagueness argument.

. E.g., Rolex Watch USA v. Meece, 158 F.3d 816, 827 (5th Cir.1998) (upholding civil counterfeiting judgment against defendant who modified "new, genuine Rolex watches” with “non-genuine parts to make them resemble more expensive Rolex watches”); Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 896 (9th Cir.1997) (defendant is liable for civil counterfeit where defendant purchased genuine, used Westinghouse Circuit breakers, refurbished them, and reattached genuine labels); Intel Corp. v. Terabyte Int’l, Inc., 6 F.3d 614, 619 (9th Cir.1993) (affirming civil judgment against defendant who purchased "slow” Intel-brand microchips and relabeled them as "fast” and more expensive chips.).

. The Lanham Act defines "counterfeit” in a manner similar to the criminal counterfeiting statute: "A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.” 15 U.S.C. §1127.

. A “MAC address” is an identification feature, unique to each item, imprinted by the manufacturer on networking equipment.

. While we have determined that the acts charged to Zhao under Count 9, and to both Zhao and Cone under the material alteration portion of Count 1, are not criminal acts under § 2320, nothing in our opinion should be construed to affect their prosecution under any other state or federal statute which may apply to these acts.

. Zhao was also charged with a third count of money laundering, Count 26, on which she was acquitted by the jury.

. Because the government never had the opportunity to address an appellate challenge to its closing arguments, the dissent’s assertion that the government has "waived waiver” is misplaced and a conclusion of pure speculation. Had Zhao raised an independent challenge to the government’s closing remarks, the government could have asserted the waiver bar in response, but was never put on notice to do so.

. Moreover, contrary to the dissent's suggestion, at 225, Zhao never argues in her post-verdict motion for acquittal that the government’s remarks were improper as to the “material alteration” theory. She only argues that the prosecutor made certain statements, unrelated to the present appeal, that were unsupported by the evidence. See Zhao’s Mot. Judgment of Acquittal 7 n.8, ECF 240. Nowhere in Zhao’s motion as to Count 8 does she mention the material alteration theory. Id. at 5-7.